IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE NO. 16-cv-80905-BLOOM/Valle

XP GLOBAL, INC., a New York
corporation,

      Plaintiff,

v.

AVM, L.P., an Illinois
limited partnership,

      Defendant.

_____/

## AMENDED COMPLAINT

Pursuant to the Court's September 19, 2016 Order [ECF No. 37], Plaintiff XP Global, Inc. ("**Global**") files this Amended Complaint against defendant AVM, L.P. ("**AVM**") and alleges as follows:

## INTRODUCTION

1.     This action primarily involves financial transactions called repurchase agreements, or repos. As explained below, repos are short-term financial arrangements in which cash is exchanged for collateral. Generally, there are trillions of dollars of daily repo transactions. But in 2008, in the midst of the recession, the repo market was in crisis. At that time, Global developed revolutionary ideas to fix the problems with the repo market through, among other things, a repo exchange. Global shared those ideas with AVM, a prominent player in the repo industry, pursuant to a confidentiality agreement. The confidentiality agreement acknowledged that Global would be providing AVM with documents and information that "is confidential, proprietary to [Global] or otherwise not generally available to the public," including

"creative financial advice and ideas in regard to the creation of the [repo] exchange/exchanges." The confidentiality agreement required that this information "be kept confidential and will not be utilized without some further agreement of compensation[.]" When Global shared its ideas with AVM, AVM immediately recognized their value. But AVM did not want to work with Global, as required by the parties' agreement. Instead, AVM ignored the confidentiality agreement and AVM's duties to Global. Lured by the potential to earn huge, nine-and-ten-figure profits using Global's ideas and information, AVM deliberately and maliciously stole Global's ideas for AVM's sole benefit. And AVM hid its unlawful conduct from Global. Were it not for a whistleblower who revealed AVM's unlawful conduct to Global, AVM's scheme would have succeeded.

## JURISDICTION AND VENUE

2.      This is an action for misappropriation of trade secrets in violation of Federal and Florida law, breach of contract, breach of fiduciary duty, fraud, and constructive fraud.

3.      This Court has subject-matter jurisdiction over this action pursuant to (a) 28 U.S.C. § 1331, because this action brings claims for misappropriating trade secrets pursuant to 18 U.S.C. §§ 1836 & 1839; (b) 28 U.S.C. § 1367(a), because all of Global's state-law claims are so related to Global's claim for misappropriating trade secrets pursuant to 18 U.S.C. §§ 1836 & 1839 that they form part of the same case or controversy; and (c) 28 U.S.C. § 1332(a) because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

4.      Global's principal place of business is in New York, where Global directs, controls, and coordinates its activities.

5.      AVM is an Illinois limited partnership. Upon information and belief, all of AVM's general and limited partners are citizens of states other than New York.

6.      Upon information and belief, to the extent AVM's general and limited partners are LLCs, all members of those LLCs are citizens of states other than New York.

7.      This Court has personal jurisdiction over AVM because AVM's principal place of business in Palm Beach County, Florida. AVM's officers direct, control, and coordinate AVM's activities from its principal place of business in Palm Beach County, Florida.

8.      Venue is proper in the Southern District of Florida under 28 U.S.C. § 1391(b), as a substantial part of the events and omissions giving rise to Global's claims occurred in this District and AVM resides in this District.

9.      All conditions precedent to the bringing of this action have been performed or waived.

## FACTUAL ALLEGATIONS

### The Repo Crisis

10.     This case primarily involves repurchase agreements, which are commonly known as "***Repos***":

> The repurchase agreement is one of the largest and most actively traded sectors in the short-term credit markets and is an important source of liquidity for money market funds and institutional investors. In its simplest form, a repurchase agreement (also commonly referred to as "repo agreements") are contractual arrangements between two parties, whereby one party agrees to sell securities to another party at a specified price with a commitment to buy the securities back at a later date for another specified price. In essence, this makes a repurchase agreement economically similar to a short-term interest-bearing loan against specific collateral. Both parties, the seller (economically, a collateral provider)

and buyer (economically, the cash lender), are able to meet their investment goals of secured funding and liquidity.[1]

11.     Repo transactions can be brokered by broker-dealers as middlemen between the collateral provider/borrower and the cash provider/lender.

12.     In 2008, as the U.S. real-estate market was suffering a historic downturn, the Repo market was also in crisis. Cash providers wanted to hold on to cash at all costs. The value of collateral providers' collateral had decreased precipitously. And both cash and collateral providers had lost confidence in the broker-dealer middlemen, following, for example, the failure of Bear Stearns and the bankruptcy of Lehman Brothers. As a result, the Repo market was under severe duress.

13.     In mid-to-late 2008, Global developed innovations to fix the Repo-market crisis. Global's innovations and ideas included developing a direct exchange for transacting Repos that, among other things, (1) eliminated the broker-dealer middlemen, (2) offered insurance/indemnification to offset any possible decrease in collateral values, (3) pre-screened participants and collateral to ensure confidence in all parties' ability to perform their obligations, and (4) contained other features that addressed the concerns of both cash and collateral providers. Global's ideas had enormous value because they could, among other things, solve the problems that were plaguing the multi-trillion-dollar Repo market at the time and revolutionize the trading of Repos. At that time, there were no Repo exchanges.

**Global Approaches AVM**

14.     Michael Carbonella is Global's owner and Chief Executive Officer.

---

[1]     *See*     https://www.blackrock.com/cash/literature/whitepaper/understanding-repurchase-agreements.pdf.

15.     In approximately October/November 2008, Carbonella told his friend Michelle Kidwell that Global had ideas to revolutionize the Repo market. Carbonella knew that Ms. Kidwell was married to Jeff Kidwell, who worked in the Repo industry/collateral debt markets at AVM. Carbonella did not share any details about Global's ideas with Ms. Kidwell.

16.     Ms. Kidwell suggested that Carbonella speak to her husband, Jeff Kidwell, regarding Global's idea.

17.     Thus, around Christmas 2008, Carbonella went to the Kidwells' apartment in New York City. At that time, Carbonella told AVM, through Mr. Kidwell, basic details about Global's idea. Before providing these basic details, Carbonella specifically told Mr. Kidwell that everything being communicated needed to be kept confidential, and Mr. Kidwell (on behalf of AVM) agreed.

18.     Mr. Kidwell was immediately enthusiastic about what Carbonella told him about Global's ideas and asked Carbonella to meet again after the holidays.

19.     Mr. Kidwell had been working for AVM since April 2008.

20.     At all times relevant to this action, Mr. Kidwell was acting on behalf of AVM.

21.     AVM describes itself as a company that "provides a wide range of brokerage, trading, and administrative services to its affiliate, III Capital Management, and other clients worldwide."[2]

22.     AVM is affiliated with III Capital Management, a group of hedge funds that claims to manage approximately $4 billion in capital.[3] AVM and III Capital Management share identical ownership.

---

[2]     https://www.avmlp.com/pages/about-us/overview.

23.     Soon after the Christmas 2008 meeting, Mr. Kidwell and Carbonella had lunch in New York. Carbonella and Mr. Kidwell (on behalf of AVM) continued their high-level discussions about Global's ideas. They discussed Global and AVM working together to implement Global's ideas. Again, Carbonella told Mr. Kidwell (on behalf of AVM) that everything discussed needed to remain confidential, and again Mr. Kidwell (on behalf of AVM) agreed. Carbonella further told Mr. Kidwell that before Global would be willing to disclose the details of its ideas, the oral confidentiality agreement would need to be reduced to writing, in the form of AVM signing a non-disclosure agreement.

24.     Mr. Kidwell told Carbonella that Mr. Kidwell's colleagues at AVM were very interested in meeting Carbonella, learning about the details of Global's ideas, and pursuing the opportunity for AVM and Global to work together to implement Global's ideas. Mr. Kidwell specifically said that one of the key owners of AVM wanted Carbonella to come to AVM's Florida office as soon as possible to give AVM the details of Global's ideas.

25.     Thus, a formal meeting between Global and AVM was arranged for January 29, 2009.

### Global Presents its Ideas to AVM, Pursuant to a Confidentiality Agreement

26.     Prior to the meeting, on January 29, 2009, Global and AVM, "on behalf of itself and its affiliates III Offshore Advisors and III Associates," entered into a Mutual Confidentiality Agreement (the "*Agreement*"). A copy of the Agreement is attached as **Exhibit "A."**

27.     AVM drafted the Agreement.

28.     Among other things, the Agreement:

---

[3]     https://www.iiicm.com/pages/home.

a. Acknowledges that Global and AVM have been engaged in "ongoing discussions about the repo markets and the creation of one or more repo 'exchanges' (the 'Proposed Transaction')";

b. Acknowledges that Global will be providing AVM with "documents or information relating to the Proposed Transaction that is confidential, proprietary to [Global] or otherwise not generally available to the public," including "creative financial advice and ideas in regard to the creation of the above referenced exchange/exchanges";

c. Acknowledges that Global will be providing this information "on a strictly confidential basis";

d. Requires that all of the information exchanged by the parties "be kept confidential and will not be utilized without some further agreement of compensation by the Receiving Party" and "will not be disclosed to or discussed with any third parties";

e. Requires AVM to "take all reasonable precautions to prevent the theft or unauthorized use of" this information;

f. Requires AVM to "immediately notify" Global "of any unauthorized use or disclosure" of the information; and

g. Acknowledges that "any unauthorized use or disclosure" of this information "may cause irreparable damage" to Global.

29. AVM executed the Agreement on behalf of itself and its "affiliates/subsidiaries." As described below, AVM deliberately hid its unlawful conduct from Global. As a result, at the present time, Global has not been able to determine whether AVM's affiliates and subsidiaries

participated in AVM's unlawful conduct. Global reserves the right to add as defendants any of AVM's affiliates or subsidiaries based on facts uncovered in discovery that reveal their participation in AVM's unlawful conduct.

30.     By executing the Agreement, AVM acknowledged that Global had innovative ideas, outside of information in AVM's possession at that time, about a Repo exchange, including "creative financial advice and ideas in regard to the creation of the above referenced exchange/exchanges." AVM further acknowledged that this information was "confidential, proprietary to [Global] or otherwise not generally available to the public" and that this information was worthy of the protections in the Agreement.

31.     On January 29, 2009, after Global and AVM signed the Agreement, Global gave AVM a detailed presentation about its ideas to revolutionize the Repo industry through the use of a Repo exchange. This included a 55-page PowerPoint presentation.

32.     This presentation included specific details about the Repo exchange, the features associated with the exchange, and how to implement the exchange, among other things. Global would not have disclosed the specific details of its ideas had AVM not signed the Agreement.

33.     Jeff Kidwell and Pat Doyle attended the January 29, 2009 presentation on behalf of AVM. Doyle worked with Mr. Kidwell at AVM.

34.     Additionally, AVM's CEO, Bill McCauley, attended portions of the presentation.

35.     AVM immediately recognized how valuable Global's ideas were. In fact, soon after the January 29, 2009 meeting, Mr. Kidwell told a third party that, based on this the meeting, AVM was ecstatic about Global's ideas.

36.     Soon after the January 29, 2009 meeting, Mr. Kidwell told a third party that AVM's CEO McCauley had a problem with Carbonella. AVM's CEO McCauley did not like

Carbonella personally, since he was "not ivy league," "too Italian," and "too Mafioso." AVM's CEO McCauley would not allow AVM to work with Carbonella.

## AVM Secretly Steals Global's Ideas

37.     Following the January 29, 2009 meeting, AVM **immediately** started working to implement Global's ideas, **without including or informing Global,** in violation of the Agreement.

38.     To the contrary, AVM hid and concealed its unlawful disclosure and use of Global's ideas from Global.

39.     For example, on or about February 13, 2009, just two weeks after the January 29, 2009 meeting, Mr. Kidwell (on behalf of AVM) met with the New York Mercantile Exchange about a Repo exchange, including implementing Global's ideas.

40.     Following that meeting, AVM's CEO McCauley yelled at Mr. Kidwell for providing information relating to the Repo exchange before getting the mercantile exchange to sign a non-disclosure agreement, since this information was so valuable.

41.     Similarly, on March 12, 2009, Mr. Kidwell (on behalf of AVM) met with the New York Stock Exchange ("*NYSE*") at the Boca Resort. Mr. Kidwell (on behalf of AVM) said to a third party that the NYSE was "ecstatic" about the Repo exchange ideas – Global's ideas. Mr. Kidwell (on behalf of AVM) further said that the NYSE was "committing" $100 million to the Repo exchange and would be paying AVM a licensing fee for intellectual property (*i.e.,* Global's intellectual property, which was subject to the Agreement).

42.     At the same time, AVM was concealing its actions from Global. Mr. Kidwell (on behalf of AVM) said to a third party, to whom he was describing the NYSE meeting, "Don't say anything to Michael [Carbonella]."

43.     AVM wanted to keep AVM's meetings secret from Global and Carbonella, since AVM was using and disclosing Global's ideas, in violation of the Agreement, its duties, and applicable law. For example, Mr. Kidwell (on behalf of AVM) instructed someone with whom he shared AVM's efforts to implement Global's ideas not to tell Carbonella anything about (a) what AVM was doing with Global's ideas or (b) AVM's efforts to implement Global's ideas. Mr. Kidwell specifically said, on behalf of AVM, that it was "very important" to keep this information from Carbonella/Global.

44.     AVM also entered into a non-disclosure agreement with the Office of the Comptroller of the Currency, for the purposes of discussing ideas—Global's ideas—relating to a Repo exchange.

45.     Around March 2009, AVM met with the Bank of New York about the Repo exchange, including Global's ideas.

46.     On March 12, 2009, as Mr. Kidwell was describing his incredibly successful meetings with, for example, the NYSE, he stated (on behalf of AVM) "I worry about Michael [Carbonella] trying to build it."

47.     "It" was the Repo exchange based on Global's ideas, which were subject to the Agreement. Mr. Kidwell said (on behalf of AVM) that he was "very worried" about Carbonella launching the Repo exchange before AVM could. Remember, the Agreement prohibited AVM from using Global's ideas without first agreeing on how Global would be compensated.

48.     On March 25, 2009, Mr. Kidwell (on behalf of AVM) met with the Bank of New York and the NYSE about the "3.4 trillion exchange." This meeting included discussions of the Repo exchange, namely the ideas that AVM obtained from Global that were subject to the Agreement.

49.     On March 25, 2009, in reference to the Repo exchange, Mr. Kidwell said, on behalf of AVM, "Fed [*i.e.,* the Federal Reserve] is next step."

50.     The same day, Mr. Kidwell said to a third party, on behalf of AVM, that the Repo exchange could result in fees to AVM of $600 million.

51.     After meeting with the Federal Reserve, Mr. Kidwell said to a third party, on behalf of AVM, that the Federal Reserve loved the Repo exchange ideas – Global's ideas.

52.     Also that same day, Mr. Kidwell was asked by a third party whether Global could launch the exchange sooner. In response, Mr. Kidwell said, on behalf of AVM, "It's complicated. He [*i.e.,* Carbonella] could do it faster. NYSE said 6 months. I am just being realistic." Mr. Kidwell acknowledged, on behalf of AVM, that AVM was implementing Global's ideas for a Repo exchange. The same ideas that the Agreement prohibited AVM from using or disclosing.

53.     On or around May 5, 2009, AVM (1) hired a new employee to spearhead the Repo exchange and (2) met with the Bank of New York about implementation of a Repo exchange, *i.e.,* Global's ideas.

54.     After the January 29, 2009 meeting, Global repeatedly asked AVM about moving forward jointly to implement Global's ideas. For a period of time, AVM gave Global misleading answers designed to trick Global into thinking that AVM and Global would work together to implement Global's ideas. Eventually, AVM stopped responding to Global's communications.

55.     By secretly and unilaterally disclosing Global's ideas to third parties, AVM deprived Global of the opportunity to (a) work with AVM to generate revenue by bringing Global's ideas to third parties, as contemplated and required by the Agreement, and (b) earn revenue by working directly with those third parties to implement Global's ideas. Once AVM

disclosed Global's ideas to these third parties, Global lost the opportunity to profit off of Global's ideas.

56.     AVM never told Global about AVM's meetings with any of the above third parties regarding Global's ideas. Instead, AVM, including through Mr. Kidwell, deliberately hid its conduct from Global.

57.     AVM kept Global and Carbonella in the dark because AVM knew how valuable Global's ideas were. Lured by the potential of massive, nine-and-ten-figure profits, AVM deliberately and maliciously stole Global's ideas. AVM raced to enter into partnerships with third parties, like the Federal Reserve and the Bank of New York, to earn money off of Global's ideas as soon as possible.

## AVM's Business Strategy Changes After Learning Global's Ideas

58.     AVM's theft of Global's ideas is evidenced by the change in AVM's business strategy to incorporate Global's ideas, as reflected in AVM's own internal documents.

59.     As of Fall 2008, AVM had not met with Global, and Global had not shared any of its ideas with AVM. Global had not yet provided AVM with Global's ideas for a Repo exchange. AVM's internal documents reflect this.

60.     Then, as discussed above, Global shared its ideas with AVM—including its ideas regarding a Repo exchange—pursuant to the Agreement.

61.     *After* learning about Global's ideas for the Repo exchange, AVM changed language in its internal documents to reflect Global's ideas.

62.     Thus, after obtaining information that the Agreement required AVM to keep confidential, including Global's ideas for creating and implementing a Repo exchange, AVM:

a. Secretly set up meetings with third parties such as the New York Mercantile Exchange, the Bank of New York, the NYSE, and the Federal Reserve, at which AVM disclosed and used Global's ideas;

b. Integrated Global's ideas into AVM's business strategies and internal documents;

c. Used Global's ideas for AVM's benefit; and

d. Took specific actions to hide AVM's unlawful activities from Global.

## AVM Profits Off of Global's Ideas

63.     AVM has a Repo product, called AVM DRX. Upon information and belief, AVM used and is using Global's ideas to develop and create AVM DRX, in violation of the Agreement.

64.     According to Mr. Kidwell, AVM does $80 billion in daily Repo transactions.

65.     Upon information and belief, AVM entered into confidential agreements with third parties such as the Federal Reserve and BNY Mellon, to use Global's ideas to create Repo exchanges. These exchanges were not launched until 2013, and even then, Global would have had no way of knowing about AVM's involvement.

66.     Upon information and belief, AVM has earned and continues to earn revenue from these agreements, and thus from Global's ideas.

67.     Mr. Kidwell, on behalf of AVM, stated that AVM would be licensing Global's ideas for a Repo exchange. Mr. Kidwell, on behalf of AVM, stated that these agreements could generate hundreds of millions of dollars for AVM.

## A Whistleblower Reveals AVM's Unlawful Scheme to Global

68.     In 2014, a whistleblower with knowledge of certain of AVM's conduct as described above approached Carbonella and told him about AVM's conduct.

13

69. Prior to that time, Global did not know, and could not have known, about AVM's unlawful disclosure and use of Global's ideas and information, including because AVM hid its unlawful conduct from Global.

70. As discussed above, AVM actively worked to keep its unlawful disclosure and use of Global's ideas and information hidden from Global.

## COUNT I – MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF 18 U.S.C. §§ 1836 & 1839

71. Global repeats and realleges the allegations in paragraphs 1 through 70.

72. Global has the rightful legal and equitable title to trade secrets, namely unique and proprietary ideas for a Repo exchange, including (a) the idea of exchange itself; (b) various features associated with the exchange, including insurance/indemnification and factoring products, procedures to approve cash and collateral providers and the collateral itself, standardized agreements, and the varying types of Repo and other products available on the exchange; and (c) how to implement the Repo exchange (the "*Trade Secrets*").

73. Global's Trade Secrets are related to a product or service used in, or intended for use in, interstate or foreign commerce, including an interstate (and international) exchange for trading Repo products.

74. The Trade Secrets are financial, business, technical, and economic information that derive independent economic value from not being generally known to, and are not readily ascertainable through proper means by, others who can obtain economic value from the disclosure and use of the Trade Secrets.

75. The Trade Secrets are a primary asset of Global.

76. Global took reasonable measures to keep its Trade Secrets secret.

14

77.     Global did not disclose the Trade Secrets to anyone—including AVM—unless the recipient agreed to keep them confidential.

78.     Global conspicuously marked documents containing the Trade Secrets as confidential. For example, the first slide in the January 29, 2009 presentation Global made to AVM is a confidentiality warning.

79.     Global provided AVM with the Trade Secrets, pursuant to the Agreement.

80.     AVM willfully and maliciously disclosed and used, and is disclosing and using, the Trade Secrets without Global's express or implied consent.

81.     At the time of AVM's disclosure and use of the Trade Secrets, AVM knew and knows that its knowledge of the Trade Secrets was acquired under circumstances giving rise to a duty to maintain the secrecy of the Trade Secrets and to limit the use of the Trade Secrets, including pursuant to the Agreement and AVM's (including through Mr. Kidwell) promises to keep the Trade Secrets secret.

82.     AVM willfully and maliciously misappropriated and is misappropriating Global's Trade Secrets, including by providing them to the New York Mercantile Exchange, the Federal Reserve, the Bank of New York, and the NYSE, and, upon information and belief, entering into agreements with these entities to use the Trade Secrets. For example, upon information and belief, AVM entered into intellectual property licensing agreements, under which AVM licensed and continues to license Global's Trade Secrets to these entities.

83.     Upon information and belief, AVM also willfully and maliciously misappropriated and is misappropriating Global's Trade Secrets in connection with AVM DRX.

84.     Upon information and belief, AVM has earned, and continues to earn, massive revenue and profits through its disclosure and use of the Trade Secrets.

85.     Global has suffered and is suffering damages because of AVM's misappropriation of the Trade Secrets.

WHEREFORE, Global requests that the Court grant it: (1) a judgment against AVM for all damages, including (a) actual damages, unjust enrichment damages, and/or reasonable royalty damages, and (b) exemplary damages; (2) its reasonable attorney's fees and costs, pursuant to 18 U.S.C. § 1836(b)(3)(D); (3) pre- and post-judgment interest; and (4) such other and further relief as this Court deems necessary and just. Global reserves the right to seek a civil seizure order pursuant to 18 U.S.C. § 1836(b)(2).

## COUNT II – MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF § 688.001, *et seq.*, FLORIDA STATUTES

86.     Global repeats and realleges the allegations in paragraphs 1 through 70 and 72.

87.     Global has trade secrets, including the Trade Secrets.

88.     The Trade Secrets are information that derive independent economic value from not being generally known to, and are not readily ascertainable through proper means by, others who can obtain economic value from the disclosure and use of the Trade Secrets.

89.     The Trade Secrets are a primary asset of Global.

90.     Global took reasonable measures to keep its Trade Secrets secret.

91.     Global did not disclose the Trade Secrets to anyone—including AVM—unless the recipient agreed to keep them confidential.

92.     Global conspicuously marked documents containing the Trade Secrets as confidential. For example, the first slide in the January 29, 2009 presentation Global made to AVM is a confidentiality warning.

93.     Global provided AVM with the Trade Secrets, pursuant to the Agreement.

16

94.     AVM willfully and maliciously disclosed and used, and is disclosing and using, the Trade Secrets without Global's express or implied consent.

95.     At the time of AVM's disclosure and use of the Trade Secrets, AVM knew that its knowledge of the Trade Secrets was acquired under circumstances giving rise to a duty to maintain the secrecy of the Trade Secrets and to limit the use of the Trade Secrets, including pursuant to the Agreement and AVM's (including through Mr. Kidwell) promises to keep the Trade Secrets secret.

96.     AVM willfully and maliciously misappropriated and is misappropriating Global's Trade Secrets, including by providing them to the New York Mercantile Exchange, the Federal Reserve, the Bank of New York, and the NYSE, and, upon information and belief, entering into agreements with these entities to use the Trade Secrets. For example, upon information and belief, AVM entered into intellectual property licensing agreements, under which AVM licensed and continues to license Global's Trade Secrets to these entities.

97.     Upon information and belief, AVM also willfully and maliciously misappropriated and is misappropriating Global's Trade Secrets in connection with AVM DRX.

98.     Upon information and belief, AVM has earned, and continues to earn, massive revenue and profits through its disclosure and use of the Trade Secrets.

99.     Global did not discover AVM's misappropriation of the Trade Secrets until June 2014, and then only because a whistleblower informed Global about AVM's misappropriation and unlawful conduct. Absent this whistleblower, Global would never have learned about this misappropriation, and could not have with the exercise of reasonable diligence discovered the misappropriation, since AVM deliberately hid its conduct from Global.

100.    Global has suffered and is suffering damages because of AVM's misappropriation of the Trade Secrets.

WHEREFORE, Global requests that the Court grant it: (1) a judgment against AVM for all damages, including (a) actual damages, unjust enrichment damages, and/or reasonable royalty damages, and (b) exemplary damages; (2) its reasonable attorney's fees and costs, pursuant to Section 688.005, Fla. Stat.; (3) pre- and post-judgment interest; and (4) such other and further relief as this Court deems necessary and just.

### COUNT III – BREACH OF CONTRACT

101.    Global repeats and realleges the allegations in paragraphs 1 through 70 and 72.

102.    AVM and Global entered into the Agreement, a valid and binding agreement.

103.    Pursuant to the Agreement, Global provided AVM with Global's confidential information and Trade Secrets.

104.    Among other things, the Agreement required AVM to keep this confidential information and the Trade Secrets "strictly confidential." In addition to the information Global provided at the January 29, 2009 meeting and thereafter, this included all information provided to AVM prior to the execution of the Agreement, since (a) the Agreement explicitly states that it was being made "in connection with ongoing discussions," and (b) the Agreement carves out certain information that is not covered by the Agreement without carving out information received by AVM prior to the execution of the Agreement.

105.    Further, the Agreement prohibited AVM from using this confidential information and the Trade Secrets "without some further agreement of compensation" to Global.

106.    AVM breached, and is breaching, the Agreement, including by:

a. Providing Global's confidential information and Trade Secrets to third parties such as New York Mercantile Exchange, the Federal Reserve, the Bank of New York, and the NYSE; and

b. Using Global's confidential information and Trade Secrets, including, upon information and belief, in connection with licensing that information to third parties and in connection with AVM DRX.

107.    As a result of AVM's breaches, Global has suffered and is suffering damages.

108.    AVM's obligations under the Agreement were and are continuing and perpetual in nature; there are no temporal limitations on AVM's obligations.

109.    AVM's breaches of the Agreement constitute continuing breaches, beginning at least as early as February 2009, continuing through the present.

110.    Global did not discover AVM's breaches until June 2014, and then only because a whistleblower informed Global about AVM's breaches and unlawful conduct. Absent this whistleblower coming forward, Global would never have learned about these breaches, and could not have with the exercise of reasonable and due diligence discovered the breaches, since AVM deliberately hid its conduct from Global. Additionally, upon information and belief, the contracts under which AVM earned and is earning revenue were all confidential.

111.    AVM misled Global and lulled Global into inaction, including not pursuing Global's legal rights, by lying about and hiding AVM's use of Global's confidential information and the Trade Secrets.

112.    AVM willfully caused Global to believe that AVM was not disclosing or using Global's confidential information and Trade Secrets. In reliance, Global did not act to pursue its legal rights.

WHEREFORE, Global requests that the Court grant it: (1) a judgment against AVM for all damages; (2) pre- and post-judgment interest; and (3) such other and further relief as this Court deems necessary and just.

## COUNT IV – BREACH OF FIDUCIARY DUTY

113.    Global repeats and realleges the allegations in paragraphs 1 through 70.

114.    AVM owed Global a fiduciary duty, including because AVM had possession of Global's confidential information (namely all of Global's confidential information relating to the creation and implementation of a Repo exchange that does not qualify as a trade secret).

115.    This fiduciary relationship is evidenced by, among other things, statements made by Mr. Kidwell to Carbonella during the Christmas 2008 meeting and the lunch meeting shortly thereafter. During these meetings, Mr. Kidwell, on behalf of AVM, specifically told Carbonella that AVM would use Global's confidential information to benefit Global. Mr. Kidwell, on behalf of AVM, said that he recognized that Global did not have the connections in the Repo industry to effectively implement Global's ideas. Instead, Mr. Kidwell, on behalf of AVM, said that Global should share its ideas with AVM, which would use its experience, reputation, and connections in the Repo industry to help Global implement its ideas – to the benefit of Global, on Global's behalf, and in Global's best interest. Mr. Kidwell, on behalf of AVM, said that if Global provided AVM with Global's confidential information, AVM could guide and advise Global regarding the implementation of its ideas based on that confidential information. Based on these statements, in addition to Mr. Kidwell's promise to keep Global's ideas confidential, Global agreed to provide its confidential information to AVM.

116.    Pursuant to its fiduciary duty, AVM was only permitted to use Global's confidential information as permitted by Global, and for the benefit of Global. AVM was not

permitted to disclose Global's confidential information to third parties or use Global's confidential information for AVM's sole benefit.

117.    Global placed trust in AVM, which accepted that trust, including by accepting Global's confidential information and expressly and impliedly agreeing to keep Global's confidential information secret and to use it for Global's benefit.

118.    AVM exercised dominion and influence over Global. AVM had power within the Repo industry and the financial industry as a whole. AVM had relationships with third parties such as the Federal Reserve and BNY Mellon. And AVM had unique access to Global's confidential information. Global relied on AVM to exercise its dominion and influence in a manner that only used Global's confidential information as permitted by Global.

119.    AVM violated, and continues to violate, its fiduciary duty to Global, including by disclosing and using Global's confidential information for AVM's sole benefit, without Global's knowledge or consent. Instead of using Global's information collaboratively with Global, AVM recognized the information's value and stole it.

120.    As a result, Global suffered damages.

121.    Global did not discover AVM's breaches of fiduciary duty until June 2014, and then only because a whistleblower informed Global about AVM's breaches of fiduciary duty and unlawful conduct. Absent this whistleblower coming forward, Global would never have learned about these breaches of fiduciary duty, and could not have with the exercise of reasonable and due diligence discovered the breaches of fiduciary duty, since AVM deliberately hid its conduct from Global. Additionally, upon information and belief, the contracts under which AVM earned and is earning revenue were all confidential.

122.     AVM misled Global and lulled Global into inaction, including not pursuing Global's legal rights, by lying about and hiding AVM's use of Global's confidential information.

123.     AVM willfully caused Global to believe that AVM was not disclosing or using Global's confidential information. In reliance, Global did not act to pursue its legal rights.

WHEREFORE, Global requests that the Court grant it: (1) a judgment against AVM for all damages, including punitive damages; (2) pre- and post-judgment interest; and (3) such other and further relief as this Court deems necessary and just.

## COUNT V – FRAUD

124.     Global repeats and realleges the allegations in paragraphs 1 through 70 and 114 through 118.

125.     AVM represented to Global that it would (a) keep Global's confidential information (namely all of Global's confidential information relating to the creation and implementation of a Repo exchange that does not qualify as a trade secret) confidential and (b) use Global's confidential information for Global's benefit.

126.     These representations were made (a) by Mr. Kidwell (on AVM's behalf) at the Christmas 2008 meeting with Carbonella and the lunch meeting shortly thereafter, (b) by Scott Wyler, AVM's general counsel, in connection with the execution of the Agreement on January 29, 2009, (c) by Mr. Kidwell and Doyle on AVM's behalf at the January 29, 2009 meeting, and (d) by Mr. Kidwell at dinner with Carbonella at Houston's in Boca Raton on the evening of January 29, 2009, where Mr. Kidwell and Carbonella continued their discussions about Global's ideas.

127.     These representations were false when made. At the time AVM made these representations, it had no intention of keeping Global's confidential information confidential. To

the contrary, immediately after obtaining this information, AVM set up meetings with third parties to disclose and use this information for AVM's benefit, without the knowledge or consent of Global. And then AVM hid this conduct from Global.

128.   For example, AVM secretly met with the New York Mercantile Exchange on February 13, 2009—just two weeks after the January 29 meeting—about implementing Global's ideas. A meeting with the New York Mercantile Exchange takes time to schedule. The fact that this meeting occurred so quickly after the January 29 meeting shows that AVM started working right away to set it up, with the intention of using Global's confidential information in a manner contrary to its representations. In fact, it is entirely possible that AVM had the Mercantile Exchange meeting set up prior to the January 29 meeting, with the intention of using the information to be obtained at the January 29 meeting for AVM's sole benefit, contrary to AVM's representations. As discussed above, AVM wanted Global to come to Florida as soon as possible to present its ideas to AVM. Upon information and belief, AVM's efforts to use Global's confidential information in a manner contrary to its representations began, at the latest, immediately after the January 29 meeting. This shows that AVM's representations were false when made. AVM cared only about getting Global's ideas, by any means necessary. Thus, AVM told Global what it wanted to hear, all to induce Global to provide its confidential information.

129.   AVM made these misrepresentations to (a) mislead Global into providing AVM with Global's confidential information, (b) trick Global into not pursuing its own use of this information, and (c) prevent Global from enforcing its legal rights under the Agreement and otherwise.

130.   Global reasonably and justifiably relied on AVM's representations, including by (a) providing AVM with Global's confidential information, (b) refraining from otherwise

pursuing a partner to develop Global's confidential information, and (c) refraining from enforcing its legal rights under the Agreement and otherwise.

131.   Additionally, AVM failed to disclose to Global material facts, including

a.   AVM's intention to use Global's confidential information for AVM's sole benefit;

b.   the fact that AVM secretly met with (i) the New York Mercantile Exchange on February 13, 2009, (2) the NYSE on March 12, 2009, (3) the Bank of New York in March 2009, (4) the NYSE and the Bank of New York on March 25, 2009, (5) the Office of the Comptroller of the Currency, (6) the Federal Reserve, and (7), upon information and belief, other third parties, all to discuss and implement Global's ideas and during which AVM disclosed Global's confidential information;

c.   AVM's use and disclosure of Global's confidential information; and

d.   upon information and belief, AVM's use of Global's information in connection with AVM DRX.

132.   These omissions were made during the Christmas 2008 meeting and the lunch meeting thereafter, as well as at and immediately after the January 29, 2009 meeting.  These omissions continue through the present.

133.   AVM had a duty to disclose these facts, including because AVM owed Global a fiduciary duty, as discussed above.

134.   AVM knew that its omissions gave Global the false impression that AVM was not using for AVM's benefit, or disclosing to third parties, Global's confidential information.

135.   AVM intentionally did not disclose these facts to induce Global to (a) enter into the Agreement, and (b) refrain from (i) pursuing use of Global's ideas on its own and (ii) acting to enforce its rights under the Agreement or otherwise.

136.   Global justifiably and reasonably relied, including by entering into the Agreement and not acting to enforce its rights under the Agreement or otherwise.

137.   Global did not discover AVM's fraud until June 2014, and then only because a whistleblower informed Global about AVM's misappropriation and unlawful conduct. Absent this whistleblower coming forward, Global would never have learned about this fraud, and could not have with the exercise of reasonable and due diligence discovered the fraud, since AVM deliberately hid its conduct from Global. Additionally, upon information and belief, the contracts under which AVM earned and is earning revenue were all confidential.

138.   AVM misled Global and lulled Global into inaction, including not pursuing Global's legal rights, by lying about and hiding AVM's use of Global's confidential information.

139.   AVM willfully caused Global to believe that AVM was not disclosing or using Global's confidential information. In reliance, Global did not act to pursue its legal rights.

140.   As a result, Global suffered and continues to suffer massive damages.

WHEREFORE, Global requests that the Court grant it: (1) a judgment against AVM for all damages, including punitive damages; (2) pre- and post-judgment interest; and (3) such other and further relief as this Court deems necessary and just.

## <u>COUNT VI – CONSTRUCTIVE FRAUD</u>

141.   Global repeats and realleges the allegations in paragraphs 1 through 70 and 114 through 118.

142.     Global and AVM had a confidential and fiduciary relationship, under which Global provided AVM with Global's confidential information (namely all of Global's confidential information relating to the creation and implementation of a Repo exchange that does not qualify as a trade secret), and AVM undertook the obligation to keep that information confidential.

143.     AVM owed fiduciary and confidentiality duties towards Global.

144.     AVM abused these fiduciary and confidentiality duties by disclosing and using Global's confidential information for AVM's benefit, without informing or including Global. In fact, AVM deliberately hid its violations of its fiduciary and confidentiality duties from Global.

145.     AVM took improper advantage of Global. Global brought its ideas to AVM based on AVM's strong presence and reputation in the Repo market. AVM manipulated and fraudulently induced Global into providing AVM with Global's confidential information. Immediately thereafter, AVM disclosed and used this information for AVM's sole advantage, to the detriment and exclusion of Global.

146.     As a result, Global suffered and continues to suffer damages.

147.     Global did not discover AVM's constructive fraud until June 2014, and then only because a whistleblower informed Global about AVM's misappropriation and unlawful conduct. Absent this whistleblower coming forward, Global would never have learned about this constructive fraud, and could not have with the exercise of reasonable and due diligence discovered the constructive fraud, since AVM deliberately hid its conduct from Global. Additionally, upon information and belief, the contracts under which AVM earned and is earning revenue were all confidential.

148.    AVM misled Global and lulled Global into inaction, including not pursuing Global's legal rights, by lying about and hiding AVM's use of Global's confidential information.

149.    AVM willfully caused Global to believe that AVM was not disclosing or using Global's confidential information. In reliance, Global did not act to pursue its legal rights.

WHEREFORE, Global requests that the Court grant it: (1) a judgment against AVM for all damages, including punitive damages; (2) pre- and post-judgment interest and (3) such other and further relief as this Court deems necessary and just.

Dated:  September 27, 2016

Respectfully submitted,

/s/Eric Ostroff
Eric Ostroff
Fla. Bar No. 10130
eostroff@melandrussin.com
Peter D. Russin
Fla. Bar No. 765902
prussin@melandrussin.com
Meaghan E. Murphy
Florida Bar No. 102770
mmurphy@melandrussin.com
MELAND, RUSSIN & BUDWICK, P.A.
3200 Southeast Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 358-6363
Facsimile: (305) 358-1221

and

Michael B. Feiler, B.C.S.
Fla. Bar No. 098477
mbf@flmlegal.com
Martin E. Leach
mel@flmlegal.com
Fla. Bar No. 0037990
FEILER & LEACH, P.L.
901 Ponce de Leon Blvd.

Suite 300
Coral Gables, Florida 33134
Telephone: (305) 441-8818
Facsimile: (305) 441-8081

*Attorneys for Global*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served on September 27, 2016 via transmission of Notices of Electronic Filing generated by CM/ECF on Defendant AVM, L.P., c/o: Michael R. Tein, Esq., Lewis Tein, P.L., 3059 Grand Avenue, Suite 340, Coconut Grove, FL 33133; and Joseph A. Fischetti, Esq. and Zachary D. Rosenbaum, Esq., Lowenstein Sandler, LLP, 1251 Avenue of the Americas, New York, NY 10020.

/s/Eric Ostroff

Eric Ostroff