UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 9:16-cv-80905-Bloom/Valle

XP GLOBAL, INC., a New York corporation

      Plaintiff,

v.

AVM, L.P., an Illinois limited partnership

      Defendant.

_____/

## DEFENDANT AVM, L.P.'S MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

**LEWIS TEIN PL**

Michael R. Tein
3059 Grand Avenue, Ste. 340
Coconut Grove, Florida 33133
(305) 442-1101 (phone)
(305) 442-6744 (fax)
Fla. Bar No. 993522
mtein@lewistein.com

**LOWENSTEIN SANDLER LLP**

Zachary D. Rosenbaum (*pro hac vice*)
Joseph A. Fischetti (*pro hac vice*)
1251 Avenue of the Americas
New York, New York 10020
(212) 262-6700 (phone)
(212) 262-7402 (fax)
zrosenbaum@lowenstein.com
jfischetti@lowenstein.com

*Counsel for Defendant AVM, L.P.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 1

FACTUAL BACKGROUND ............................................................................................... 2

SUMMARY JUDGMENT STANDARD ............................................................................ 2

LEGAL ARGUMENT ......................................................................................................... 2

I.      XP's Claims Are Barred by the Applicable Statutes of Limitations. .................... 2

II.     Summary Judgment Should Be Granted Dismissing XP's Claims for Breach of
        Contract with Prejudice .......................................................................................... 7

        A.      AVM Never Disclosed or Utilized XP's Ideas. ......................................... 8

        B.      AVM's Industry Expert Opined without Rebuttal or Refutation by
                Plaintiff that XP's Ideas Are Uninformed and Not Viable or Proprietary ... 9

        C.      XP Suffered No Compensable Contract Damages. ................................... 11

III.    Summary Judgment Should Be Granted Dismissing XP's Statutory Trade Secrets
        Claims Under DTSA and UTSA ........................................................................... 13

        A.      XP's DTSA Claim Is Barred Because the Alleged Misappropriation Pre-
                Dates the Effective Date of the Civil Penalty That Plaintiff Seeks. ........ 13

        B.      XP's DTSA and UTSA Claims Fail Because XP Cannot Demonstrate That
                It Possessed Any Trade Secrets. ............................................................... 14

        C.      XP's DTSA and UTSA Claims Also Fail Because AVM Did Not
                Misappropriate Any So-Called Trade Secrets Belonging to XP and XP Did
                Not Suffer Any Damages As a Result of Any Misappropriation. ............ 16

IV.     Summary Judgment Should Be Granted Dismissing XP's Claim for Fraud By
        Omission. ............................................................................................................... 17

CONCLUSION .................................................................................................................. 20

## <u>TABLE OF AUTHORITIES</u>

**PAGES**

Cases

*Access 4 All, Inc. v. Bamco VI, Inc.*,
No. 11-61007, 2012 WL 33163 (S.D. Fla. Jan. 6, 2012) .........................................................11

*Adams Arms, LLC v. Unified Weapon Sys., Inc.*,
No. 16-1503, 2016 WL 5391394 (M.D. Fla. Sept. 27, 2016)............................................5, 14

*Alphamed Pharms. Corp. v. Arriva Pharms, Inc.*,
432 F. Supp. 2d 1319 (S.D. Fla. 2006) ...................................................................................17

*Aprigliano v. Am. Honda Motor Co., Inc.*,
979 F. Supp. 2d 1331 (S.D. Fla. 2013) ...................................................................................17

*Avago Techs. U.S. Inc. v. Nanoprecision Prods., Inc.*,
No. 16-3737, 2017 WL 412524 (N.D. Cal. Jan. 31, 2017)......................................................14

*Bah. Sales Assoc., LLC v. Byers*,
No. 08-1012, 2017 WL 3782804 (M.D. Fla. Aug. 31, 2017) ..................................................11

*Brooks v. Cty. Comm'n of Jefferson Cty., Ala.*,
446 F.3d 1160 (11th Cir. 2006) ................................................................................................2

*Brough v. Imperial Sterling Ltd.*,
297 F.3d 1172 (11th Cir. 2002) ..............................................................................................12

*Crowley Am. Transp., Inc. v. Richard Sewing Mach. Co.*,
172 F.3d 781 (11th Cir. 1999) ................................................................................................13

*Davis v. Monahan*,
832 So. 2d 708 (Fla. 2002).................................................................................................5, 6

*De Sandoval v. Attorney General*,
440 F.3d 1276 (11th Cir. 2006) ..............................................................................................14

*Dugas v. 3M Co.*,
101 F. Supp. 3d 1246 (M.D. Fla. 2015)...................................................................................17

*EarthCam, Inc. v. OxBlue Corp.*,
49 F. Supp. 3d 1210 (N.D. Ga. 2014) ....................................................................................15

*Hall v. Teva Pharm. USA, Inc.*,
214 F. Supp. 3d 1281 (S.D. Fla. 2016) .....................................................................................2

*HGI Associates, Inc. v. Wetmore Printing Co.*,
  427 F.3d 867 (11th Cir. 2005) ....................................................................20

*HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.*,
  685 So. 2d 1238 (Fla. 1996).......................................................................20

*Hydrogen Master Rights, Ltd. v. Weston*,
  228 F. Supp. 3d 320, 338 (D. Del. 2017) ...................................................14

*Ingenuity, Inc. v. Linshell Innovations Ltd.*,
  No. 11-93, 2014 WL 1230695 (M.D. Fla. Mar. 25, 2014) ..........................7

*Johnson Enters. of Jacksonville, Inc. v. FLP Grp., Inc.*,
  162 F.3d 1290 (11th Cir. 1998) ..................................................................12

*Landgraf v. USI Fil Prods.*,
  511 U.S. 244 (1994).....................................................................................14

*M.C. Dean, Inc. v. City of Miami Beach, Fla.*,
  199 F. Supp. 3d 1349 (S.D. Fla. 2016) ..................................................15, 16

*MCI Worldcom Network Servs., Inc. v. Mastec, Inc.*,
  995 So. 2d 221 (Fla. 2008)...........................................................................7

*Minotty v. Baudo*,
  42 So. 3d 824 (Fla. 4th DCA 2010) .............................................................19

*Morgan Stanley & Co. v. Coleman (Parent) Holdings, Inc.*,
  955 So. 2d 1124 (Fla. 4th DCA 2007) .........................................................19

*Mortgage Now, Inc. v. Stone*,
  No. 09-80, 2009 WL 4262877 (N.D. Fla. Nov. 24, 2009).........................16

*Myerburg v. Medtronic, Inc.*,
  No. 03-20616, 2004 WL 5622263 (S.D. Fla. Sep. 28, 2004) .....................15

*Philip Morris USA, Inc. v. Hess*,
  95 So. 3d 254 (Fla. 4th DCA 2012) .............................................................17

*Proudfoot Consulting Co. v. Gordon*,
  576 F.3d 1223 (11th Cir. 2009) ...................................................................12

*Rollins, Inc. v. Butland*,
  951 So. 2d 860 (Fla. 2d DCA 2006) .............................................................7

*Servicios de Almacen Fiscal Zona Franca Y Mandatos S.A. v. Ryder Int'l, Inc.*,
  264 F. App'x 878 (11th Cir. 2008) .............................................................3, 4

*Sierra Club v. Ga. Power Co.*,
   No. 02-151, 2007 U.S. Dist. LEXIS 100219 (N.D. Ga. Jan. 11, 2007)..................................11

*Tiara Condo Ass'n, Inc. v. Marsh & McLennan Companies, Inc.*,
   110 So. 3d 399 (Fla. 2013).........................................................................................18

*Whitby v. Infinity Radio Inc.*,
   951 So. 2d 890 (Fla. 4th DCA 2007) ..........................................................................12

*XTec, Inc. v. Hembree Consulting Servs., Inc.*,
   183 F. Supp. 3d 1245 (S.D. Fla. 2016) .......................................................................12

STATUTES

18 U.S.C. § 1836(b)(1) .....................................................................................................13

18 U.S.C. § 1836(b)(3)(D) ...............................................................................................16

18 U.S.C. § 1836(d) ........................................................................................................3, 5

18 U.S.C. § 1839(3) ..........................................................................................................15

18 U.S.C. § 1839(5) ..........................................................................................................14

18 U.S.C. § 1839(5)(B)(ii)(II)...........................................................................................16

Fla. Stat. § 95.11(2)(b) .......................................................................................................3

Fla. Stat. § 95.11(3)(j) ........................................................................................................3

Fla. Stat. § 688.002 ...........................................................................................................15

Fla. Stat. § 688.002(2)(b) .................................................................................................16

Fla. Stat. § 688.005 ...........................................................................................................16

Fla. Stat. § 688.007 .............................................................................................................3

Pub. L. No. 104-294, § 101, 110 Stat. 3488 (1996).........................................................13

Pub. L. No. 114-153, § 2, 130 Stat. 376 (2016)...............................................................13

Pub. L. No. 114-153, § 2(e) ..............................................................................................14

RULES

FRCP 11 ..............................................................................................................................4

FRCP 12(b)(6) .....................................................................................................................3

AVM, though counsel, pursuant to Local Rules 7.1 and 56.1, hereby files its Motion for Summary Judgment against Plaintiff, and states as follows:[1]

## PRELIMINARY STATEMENT

Plaintiff is a defunct company with no employees, no revenue for a decade (if ever), and no experience with repos (*see* SOMF ¶¶ 3-5), securities exchanges, computer programming, or software development. Plaintiff's principal, Michael Carbonella ("Carbonella"), was a screen actor and a real estate agent, and he operated a graphics design company, among other apparent employment endeavors. Yet, as its story goes, Plaintiff made a presentation to AVM in January 2009 regarding supposedly "revolutionary" "ideas" regarding a repo exchange and "immediately" thereafter, AVM "started working to implement" XP's ideas. Discovery has proven Plaintiff's assertions in the Amended Complaint not only false and misleading, but pure fiction.

AVM was extensively discussing its development of a repo exchange internally and externally well before ever meeting with XP, as confirmed in numerous contemporaneous writings. And although Carbonella made a presentation at AVM regarding his so-called "ideas," AVM's internal emails demonstrate that it quickly found XP's concepts to be unintelligible and Carbonella to be unprofessional and uninformed; in fact, AVM's Chief Executive Officer noted in an email that Carbonella "sounds like a crackpot," prompting AVM's Chief Technology Officer to remark that was "putting it nicely." AVM never disclosed or utilized any "idea" that originated with XP. Moreover, AVM has never launched a repo exchange. These indisputable realities are fatal to XP's claims for breach of contract, violations of Defend Trade Secrets Act of 2016 ("DTSA") and Florida's Uniform Trade Secrets Act ("UTSA"), and fraudulent omission.

AVM produced over 93,000 pages of documents; third parties produced over a thousand additional pages of documents; and twelve different individuals have been deposed. Plaintiff has come up empty-handed. There is no evidence—nothing—to support XP's meritless claims. Summary judgment should be granted and this frivolous case should be dismissed.

---

[1] Capitalized terms not otherwise defined herein carry the same meaning as ascribed in AVM's Statement of Material Facts.

## FACTUAL BACKGROUND

In support of this motion, AVM relies upon and incorporates by reference its Statement of Material Facts and the Declarations filed herewith.

## SUMMARY JUDGMENT STANDARD

Pursuant to Federal Rule of Civil Procedure ("FRCP") 56, a motion for summary judgment must be granted if, based on "materials in the record, including depositions, documents, . . . admissions, [and] interrogatory answers," the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

For purposes of summary judgment, "[a]n issue is genuine if 'a reasonable trier of fact could return judgment for the non-moving party'" and "[a] fact is material if it 'would affect the outcome of the suit under the governing law.'"  *Hall v. Teva Pharm. USA, Inc.*, 214 F. Supp. 3d 1281, 1287-88 (S.D. Fla. 2016) (citations omitted).  The moving party bears the "initial burden of showing the absence of a genuine issue of material fact," at which point "the nonmoving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'"  *Id.* at 1288.  While all reasonable inferences must be drawn in favor of the nonmoving party, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party."  *Id.* at 1287-88 (quoting *Brooks v. Cty. Comm'n of Jefferson Cty., Ala.*, 446 F.3d 1160, 1162 (11th Cir. 2006)).

## LEGAL ARGUMENT

### I.      XP's Claims Are Barred by the Applicable Statutes of Limitations.

On January 30, 2009, AVM and XP had an in-person meeting, during which XP presented its so-called ideas for a repo exchange to AVM.  (Statement of Material Facts ("SOMF") ¶¶ 28-38.)  While XP has absolutely no proof that supports its ensuing allegations—rather, discovery has demonstrated them to be patently false—XP contends that AVM "***immediately*** started working to implement [XP's] ideas" and disclosed those ideas in meetings held in February and March 2009. (Am. Compl. (ECF No. 37) ¶¶ 37, 39, 41, 48.)  The last communication from XP to AVM occurred in April 2009 and the last alleged disclosure by AVM of Plaintiff's ideas occurred in May 2009.

(SOMF ¶ 47; Am. Compl. ¶ 53.)  XP commenced this litigation more than seven years later, on June 3, 2016.  The case presently includes counts for: (1) breach of contract; (2) violation of the DTSA; (3) violation of the UTSA; and (4) common-law fraudulent omission. Each of these remaining claims carries a statute of limitations of five years or less.  *See* 18 U.S.C. § 1836(d) (three years for DTSA claim); Fla. Stat. § 95.11(2)(b) (five years for breach of contract); Fla. Stat. § 95.11(3)(j) (three years for fraud); Fla. Stat. § 688.007 (three years for UTSA claim).

As set forth in the Sections below, the four remaining counts in this case fail as a matter of law based on the indisputable factual record and, accordingly, the action should be dismissed with prejudice on the merits.  However, before the Court even reaches those arguments, it can and should dismiss those claims as time-barred.  Indeed, this case is a textbook example of why statutes of limitations exist.  Plaintiff has brought what purports to be an intellectual property case.  Yet its sole principal, Carbonella, claims that because of the passage of time, he has forgotten the names of every single person he supposedly met with in developing his so-called "revolutionary" ideas for a repo exchange, and he claims to have destroyed all of his purported research and written communications related to that development. (SOMF ¶ 29.) He even claims to have destroyed or misplaced a supposed confidentiality agreement he entered into with someone named "Frank," who XP contends had a platform for trading commodities, such as bananas, that could somehow (inexplicably) have been used to develop a repo exchange.  (SOMF ¶ 33.)  AVM is thus left defending against sophistry and fabrication—not evidence.

With respect to breach of contract, this Court found on a FRCP 12(b)(6) standard that XP pleaded sufficient facts to allow its otherwise late claims to survive under the continuing violation doctrine, which "permits a plaintiff to sue on an otherwise time-barred claim when additional violations of the law occur within the statutory period," and the continuing breach doctrine, which provides that "accrual of a breach of contract cause of action commences upon the occurrence of the last breach or upon termination of the contract."  ECF No. 37, at 5-6 (citations omitted); *see also Servicios de Almacen Fiscal Zona Franca Y Mandatos S.A. v. Ryder Int'l, Inc.*, 264 F. App'x 878, 880 (11th Cir. 2008) ("Florida does not apply the discovery rule to § 95.11(2)(b) [which

governs contract claims], so the date of accrual is the date of the first breach."). Specifically, and critically, in assessing the original Complaint, the Court found that "[a]t this stage of the pleadings, and accepting Plaintiff's allegations as true," the continuing violation and breach doctrines potentially applied because XP alleged that: (i) "[AVM] has used [XP's] ideas to create a repo exchange product, AVM DRX"; (ii) AVM "entered into confidential agreements with third parties to use [XP's] ideas to create repo exchanges that were launched in 2013"; and (iii) "AVM's continued use of [XP's] confidential information and ideas" amounted "to a continuous tortious act." *Id.* at 7-8. Discovery has proven those and other allegations to be false.[2]

Plaintiff initially alleged that "AVM has a Repo exchange product, called AVM DRX," that is predicated on "[Plaintiff's] ideas." (Compl. (ECF No. 1) ¶ 63.) That allegation was false. AVM DRX is a website on which AVM manually posts indicative rates for repo transactions. (SOMF ¶ 19.) It is not an exchange, and Plaintiff could have easily confirmed this fact by reviewing the Security Exchange Commission ("SEC") public registries available online, which list all national securities exchanges ("NSE") and alternative trading platforms ("ATS"), or asking AVM for access to the DRX website, or both. Moreover, AVM DRX (through its predecessor in name, AVM RPX) has been in existence since before AVM even met with XP. (SOMF ¶ 19.) There is simply no way to hide a repo exchange, as exchanges are highly regulated and, by definition, highly visible to the marketplace. Plaintiff cannot proffer any proof on a summary judgment record (there is none) that its ideas were in any way utilized on AVM DRX or RPX.

Similarly, the Amended Complaint falsely alleged that AVM entered into agreements with "[FRB] and [BNY], to use [Plaintiff's] ideas to create Repo exchanges." (Am. Compl. ¶ 65.) Although AVM entered a confidentiality agreement with BNY in November 2008, long before it even met with XP, AVM never entered any agreement to create a repo exchange with anyone and, in fact, has never launched a repo exchange. (SOMF ¶¶ 49, 51.) The Amended Complaint also

---

[2] These assertions, among many others, are the subject of a sanctions motion that AVM served on Plaintiff on October 31, 2017—which motion remains in FRCP 11's 21-day safe harbor for voluntary withdrawal as of this filing.

charges that "[t]hese exchanges were not launched until 2013." (Am. Compl. ¶ 65.) But, when asked during the last day of his deposition on October 25, 2017 to identify these supposed "exchanges," Carbonella first identified the FRB's "reverse repo facility" (Ex. K (Carbonella Dep.) at 521:8-16), which he admitted is ***not an exchange***, stating: "I consider it a step in that direction." (*Id.* at 521:17-21.) And, then, with respect to BNY's supposed "exchange," Carbonella testified: "They're almost right there. They're right at the edge of what we would describe it." (*Id.* at 522:2-526:14.) Plaintiff thus admits that both of the so-called "exchanges . . . launched in 2013" are still today, in late 2017, not exchanges at all—let alone exchanges that use XP's so-called ideas.

Accordingly, the factual predicates in the original Complaint that formed the basis for the Court's denial at the pleadings stage of AVM's motion to dismiss Plaintiff's breach of contract claim as time-barred are false. Plaintiff has not—and cannot—come forward with proof of any contractual violation, let alone a continuing one, because there is none.

For largely identical reasons, Plaintiff's claims are also time-barred by the three-year periods applicable under the DTSA, UTSA and to fraudulent omission. *See Adams Arms, LLC v. Unified Weapon Sys., Inc.*, No. 16-1503, 2016 WL 5391394, at *5-6 (M.D. Fla. Sept. 27, 2016) (DTSA claim has "a statute of limitations substantially similar to" UTSA claim and accrues on "the date on which the misappropriation with respect to which the action would relate is discovered or by the exercise of reasonable diligence should have been discovered" (quoting 18 U.S.C. § 1836(d))); *Davis v. Monahan*, 832 So. 2d 708, 709-10 (Fla. 2002) (fraud claim accrues when "plaintiff either knows or should know that the last element of the cause of action occurred").

On April 14, 2009, Carbonella sent an email to Mr. Kidwell conveying his suspicion that AVM was disclosing or utilizing XP's ideas—stating "Hmmmm," which he intended to mean "is this you?" (SOMF ¶ 45.) Neither Mr. Kidwell nor anyone else at AVM responded to Carbonella, though Mr. Kidwell observed internally that Carbonella "was very unprofessional, self-promoting, and maybe even a little insulting." (SOMF ¶¶ 45-47.) By then, AVM had no interest in XP, but Carbonella's email nonetheless reflects XP's (erroneous) suspicion that AVM utilized and disclosed XP's ideas in an unauthorized manner. ***For the next five years***, from March 2009

through July 2014, Carbonella remained on the distribution list of Mr. Kidwell's electronic newsletter called the "AVM Repo Commentary." During that period, AVM sent XP *at least 253* transmissions containing AVM's Repo Commentary—each providing updates regarding AVM's activity in the repo markets. (SOMF ¶ 48.) And, in 144 of those AVM Repo Commentaries, XP was expressly invited to access AVM RPX. (*Id.*) For example, the April 3, 2009, AVM Repo Commentary stated as follows:

> <u>Direct Repo Update</u>
>
> Please sign on to AVM RPX on our website http://www.avmlp.com. In order to access AVM RPX, go to the website, click on AVM Solutions, click on AVM RPX at the bottom of the list, then register for a Login and Password. I will then approve you. AVM RPX has indications and axes from Collateral Providers and Cash Providers and is our OTC marketplace for Direct Repo.

(Ex. SS at XP000279.)

That is hardly the conduct of someone hiding information from XP. Quite the contrary, AVM was indifferent to XP because it concluded by the end of February 2009 that Carbonella's ideas made no sense. (SOMF ¶ 44.) While he now self-servingly calls them "revolutionary," other than presenting his ideas to AVM in January 2009, Carbonella did absolutely nothing to advance them with anyone else in the market, nor did he investigate his unfounded suspicions regarding AVM when he allegedly had them in April 2009. (SOMF ¶ 47.) Had Plaintiff, for example, at any point bothered to review the SEC's registry of NSEs and ATSs, it would have seen that AVM does not (and never did) operate a securities exchange or alternative trading platform of any kind. (SOMF ¶¶ 17, 51.) Plaintiff could have readily accessed this information many years before bringing this groundless suit. Further, Plaintiff needed only to have read the AVM Repo Commentary that AVM delivered to Plaintiff (among thousands of others) to read updates on the development of AVM RPX or AVM's activities in the repo market.

In sum, while XP has no genuine claims against AVM, all the causes of action it has asserted accrued—if at all—more than five years before this case was instituted on June 6, 2016. Therefore, the case should be dismissed in its entirety with prejudice as time-barred.

## II.     Summary Judgment Should Be Granted Dismissing XP's Claims for Breach of Contract with Prejudice.

Under Florida law, "[t]he elements of an action for breach of contract are: (1) the existence of a contract, (2) a breach of the contract, and (3) damages resulting from the breach." *Ingenuity, Inc. v. Linshell Innovations Ltd.*, No. 11-93, 2014 WL 1230695, at *7 (M.D. Fla. Mar. 25, 2014) (quoting *Rollins, Inc. v. Butland*, 951 So. 2d 860, 876 (Fla. 2d DCA 2006)), *aff'd*, 644 F. App'x 913 (11th Cir. 2016).  If a plaintiff demonstrates a breach of contract, it can recover "compensatory or actual damages for the loss or injury caused by the action of the defendant," but it cannot "recover compensatory damages in excess of the amount which represents the loss actually inflicted by the action of the defendant."  *Id.* (quoting *MCI Worldcom Network Servs., Inc. v. Mastec, Inc.*, 995 So. 2d 221, 223 (Fla. 2008)).

> The Agreement (Ex. S) contains mutual obligations and, as to XP, states that:
>
> In connection with ongoing discussions about the repo markets and the creation of one or more repo 'exchanges' (collectively, the "Proposed Transaction")[,] … XP may . . . provide AVM with documents or information relating to the Proposed Transaction that is confidential, proprietary to XP or otherwise not generally available to the public.  This includes but is not limited to - creative financial advice and ideas in regard to the creation of the above referenced exchange/exchanges.

The Agreement defines such documents and information as "Information" that "will be kept confidential and will not be utilized without some further agreement of compensation by the Receiving Party . . . and will not be disclosed to or discussed with any third parties[.]"  (Ex. S.)  The Agreement excludes from such obligations, in relevant part: "Information (1) that is already in the public domain; (2) that subsequently becomes available to third parties through no breach of the terms of this agreement by the Receiving Party, [or] (3) that was already in the Receiving Party's possession prior to its disclosure by the Disclosing Party."  (*Id.*).

While XP's contentions have been a moving target since the outset of this case, on October 25, 2017, after being compelled by the Court to answer questions regarding the factual bases for its allegations, XP confirmed that—despite having taken extensive discovery from AVM, BNY, FRB, and CME to name a few—XP's assertions of purported disclosure by AVM are not derived from

evidence (there is none) but from the false innuendo conveyed to Carbonella by Mr. Kidwell's estranged wife based on communications in 2009.  (Ex. K (Carbonella Dep.) at 435:11-436:13.)  This motion raises three questions for the Court, each of which independently disposes of this cause of action when answered in the negative: (i) has XP come forward with any evidence demonstrating that AVM disclosed or utilized any of XP's ideas in violation of the Agreement and if so what, to whom and when?; (ii) do such ideas constitute Information that AVM did not already possess or that was not in the public domain?; and (iii) has XP suffered any compensable damages?

Since there are no genuine issues of material fact as to any of these questions—the answer to each is "no"—Plaintiff's claim for breach of contract should be dismissed with prejudice.

### A.  AVM Never Disclosed or Utilized XP's Ideas.

AVM did not disclose or utilize *any* of XP's so-called ideas, let alone ideas that qualify as protected Information under the Agreement.  As an initial matter, not only was AVM indisputably working on repo exchange concepts internally long before ever meeting with XP, but AVM had also been communicating extensively in writing with FRB, BNY, NYSE and others regarding those concepts since at least October 2008. (SOMF ¶¶ 13, 18.)   The documentary evidence, moreover, overwhelmingly establishes that XP solicited AVM to pitch itself as a purported technology solution for *AVM's* exchange concepts.  (SOMF ¶¶ 20-24.)  In Carbonella's first email to Mr. Kidwell on the subject, dated January 16, 2009, he referenced Mr. Kidwell's October 7, 2008 letter to the FRB and explained that he "believe[s] there may be a way to execute *your Repo Exchange idea* without having to utilize the [FRB] … Great idea by the way[.]"  (SOMF ¶ 20 (emphasis added).)  In a subsequent letter to Mr. Kidwell, Carbonella referred to "the Idea's [sic] you have already presented."  (SOMF ¶ 22.)  Mr. Kidwell also met Mr. Carbonella for lunch on January 19, 2009 to discuss what he described to AVM as "*a trading network* solution *for our [AVM's] Repo Exchange*."  (SOMF ¶ 21.)  Shortly after Plaintiff presented its so-called ideas on January 30, 2009, AVM dismissed XP as an option because XP's concepts were unintelligible and Carbonella exhibited himself to be uninformed and unprofessional.  On February 26, 2009, in

response to one of several rambling emails by Carbonella, AVM's Chief Executive Officer quipped that "this guy sounds like   crackpot!" to which AVM's Chief Technology Officer responded, "putting it nicely."   (SOMF ¶ 44.)    AVM never utilized XP's ideas and it never disclosed XP's ideas to anyone, ever.  (SOMF ¶ 52.)

Ultimately, in the nearly 100,000 pages of documents that have been produced in discovery by XP, AVM, FRB, BNY, and others, and the thousands of pages of deposition testimony, there is not one instance of disclosure by AVM of any of XP's ideas to any third party.  (*See* SOMF ¶ 52.) Nor is there a shred of evidence that AVM itself ever utilized XP's ideas.  Moreover, AVM never even launched a repo exchange (SOMF ¶ 51) or developed any financial projections in connection with a repo exchange, performed any revenue analyses regarding a repo exchange, performed any valuation analyses regarding a repo exchange, or advanced far enough in the process of considering a repo exchange to determine how AVM could monetize such an exchange (SOMF ¶ 53).  Further, contrary to the Amended Complaint's allegations, AVM has never entered any intellectual property licensing agreements in connection with a repo exchange.  (SOMF ¶ 54.)

### B.  AVM's Industry Expert Opined without Rebuttal or Refutation by Plaintiff that XP's Ideas Are Uninformed and Not Viable or Proprietary.

AVM has proffered the expert opinions of Paul M. Friedman, who has spent almost 35 years working in the securities industry, with decades of experience in repos.  Mr. Friedman was the Chief Operating Officer of Fixed Income of Bear Stearns & Co., Inc. for 10 years, with direct supervision over the firm's repo desk; joined Mariner Partners LLC, where he negotiated repo agreements with dealers and was a member of the firm's investment committee; and was Chief Operating Officer of Guggenheim Securities, LLC for six years, with direct supervision of the firm's repo desk.  He has also served as an expert regarding repos in a number of cases.  (Ex. QQ at 1-5.)

Mr. Friedman was asked to review and evaluate the ideas that XP asserts it conveyed to AVM regarding a so-called repo exchange, along with certain other documents and testimony, with the "focus of opining on (i) whether XP's ideas are viable—that is, do the ideas convey a

formula, pattern, compilation, program, device, method, technique, or process, or financial, technical, business, or economic information, that derive economic value from not being generally known; (ii) whether XP's ideas are proprietary—that is, were the ideas (in whole or part) not publicly known at the time they were conveyed or have they since become publicly known; and (iii) whether AVM is engaging in the activities contemplated by XP."  (Ex. QQ at 1.)

Mr. Friedman prepared a 41-page report, assessing four so-called ideas he could discern from the record before him, which he described as follows: "[1] [a]ll participants and assets would be preapproved and prequalified and an asset, once qualified, would never need to be reviewed again for the life of the asset; [2] [r]epo contracts could be insured against loss by an unidentified insurance company or companies and/or an unidentified factoring company or companies; [3] [r]epo participants would have the ability to exit transactions prior to their contractual termination for a "slight, predetermined cost" regardless of any changes in market rates or market conditions; [4] [c]redit rating agencies would guarantee against losses from declines in collateral values."  (Ex. QQ at 9-10.)   Additionally, Mr. Friedman considered whether XP's so-called exchange would provide a collateral management platform for repo participants, which is now an assertion made by Carbonella during depositions, though it is not an idea referenced in XP's presentation deck.  (*Id.*)  Mr. Friedman also opined on the following two questions: (i) is or was the idea of an electronic platform on which repos could be transacted proprietary to XP and, to that end, were there in 2008 or are there now exchanges or systems on which repos trade?; and (ii) is AVM engaging in the "repo exchange" activities that XP allegedly contemplated?  (*Id.* at 32-41.)

Based on his experience in the repo markets and the securities industry, and at least 28 public sources, coupled with his review of the record before him—which included, *inter alia*, XP's presentation deck, its interrogatory answers, and Carbonella's deposition testimony—Mr. Friedman delineated five separate opinions as to Plaintiff's so-called ideas, finding that each idea was uninformed and not viable or proprietary.  Mr. Friedman also opined that "the idea that repo transactions be disintermediated and that such disintermediation occur through an electronic trading platform is not unique or proprietary[.]"  (Ex. QQ at 39.)  Finally, he opined that "[t]he

repo rates shown on the DRX website are not live or executable; therefore, the DRX website is not an electronic securities exchange and does not utilize the so-called ideas that XP contends it communicated to AVM . . . [and that he had seen] no indication that AVM ever operated a NSE or ATS or otherwise engaged in the activities XP alleges it communicated to AVM." (*Id.* at 41.)

XP has not proffered an expert on any of those subjects, either affirmatively or in rebuttal to Mr. Friedman's report.  The summary judgment record is thus uncontested with respect to Mr. Friedman's opinions.  On that basis, XP's breach of contract claim (as well as the balance of its claims, which will be addressed below) should be dismissed with prejudice.  *See Bah. Sales Assoc., LLC v. Byers*, No. 08-1012, 2017 WL 3782804, at *11 & n.28 (M.D. Fla. Aug. 31, 2017) (granting summary judgment because plaintiffs "did not substantively address defendant's experts' findings as to causation or submit any rebuttal expert reports"); *Access 4 All, Inc. v. Bamco VI, Inc.*, No. 11-61007, 2012 WL 33163, at *7 (S.D. Fla. Jan. 6, 2012) (granting summary judgment because plaintiffs "provided no support, other than their bare allegations, to rebut Defendant's expert testimony"); *Sierra Club v. Ga. Power Co.*, No. 02-151, 2007 U.S. Dist. LEXIS 100219, at *18-19 (N.D. Ga. Jan. 11, 2007) (granting summary judgment because defendant's "unrefuted expert" contradicted plaintiff's claim and plaintiff could not show "a genuine issue of material fact for trial, in the absence of expert testimony, by pointing to a few inconclusive documents").

### C.  XP Suffered No Compensable Contract Damages.

Plaintiff started this case alleging that "AVM has earned and continues to earn revenue from . . . [XP's] ideas."  (Am. Compl. ¶ 66).  But now, with no support in discovery for that false accusation, Plaintiff has created a contorted theory of consequential damages, on the confounding premise that XP was suffered a loss essentially because its counsel asked an accountant, Gregory R. Haller, CPA—with no qualifications in repos, securities, or valuation—to *assume* that XP's exchange would have captured 5%-20% of a $3 trillion *assumed* repo market, with a 5%-20% *assumed* chance the ideas would succeed, using erroneously *assumed* pricing and development costs and no other overhead, with an *assumed* right by XP to 10% of this imagined venture's profits—all gleaned from whole cloth with absolutely no support from any record evidence.  (*See*

accompanying Motion to Preclude Report and Testimony of Gregory Haller ("Haller Motion") & Ex. E thereto.)  Plaintiff's damages theory fails as a matter of fact and law.

First, for the reasons set forth in Point B, above, Mr. Friedman's unrebutted opinions that Plaintiff's ideas are not viable and have no value, as well as his irrefutable response to Mr. Haller's report, end this issue summarily.  (Ex. QQ; Haller Motion, Ex. E.)  There are no genuine issues of material fact as to Plaintiff's purported damages because it has none.

Second, there is no evidence in the record that supports the notion that XP's unintelligible ideas would have been technologically possible or plausible; would have received any regulatory approvals; would have attracted any insurers, factors or rating agencies; or would have attracted any repo market participants.  Nor is there a scintilla of evidence in the record as to how much any or all of XP's ideas would cost to implement; who would pay for it, and who would possibly give XP an equity stake in an imaginary venture for which XP was contributing no capital or know-how; or whether and how the venture would earn revenue.  In short, Plaintiff's damages theory goes beyond wild speculation; it is pure fantasy.  *See Brough v. Imperial Sterling Ltd.*, 297 F.3d 1172, 1177 (11th Cir. 2002) (to recover lost profits, "[t]he mind of a prudent impartial person should be satisfied that the damages are not the result of speculation or conjecture" (quoting *Johnson Enters. of Jacksonville, Inc. v. FLP Grp., Inc.*, 162 F.3d 1290, 1325 (11th Cir. 1998))); *XTec, Inc. v. Hembree Consulting Servs., Inc.*, 183 F. Supp. 3d 1245, 1260 (S.D. Fla. 2016) ("damages may not be awarded for lost profits when those profits are dependent on a party taking action that it is unclear he would have taken" (quoting *Brough*, 297 F.3d at 1177)).

Third, XP "bears the burden to prove both that it sustained a loss and that 'its lost profits were a direct result of' [defendant's] breaches of the" Agreement.  *Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1243 (11th Cir. 2009) (quoting *Whitby v. Infinity Radio Inc.*, 951 So. 2d 890, 898 (Fla. 4th DCA 2007)).  To that end, it is important to note what the Agreement did and did not require.  The Agreement was purely exploratory by its very nature and neither party was obligated to do any business with the other; rather, they were obligated only to refrain from disclosing the other's protected Information or utilizing such Information without a separate

economic arrangement. (Ex. S.)  XP's damages claim nonetheless revolves around a preposterous (and circular) causation theory that, while to this day no one in the market has actually built anything like XP's exchange, including AVM—*i.e.*, the same opportunity exists today that existed in 2009—AVM's purported breaches somehow, inexplicably prevented XP from developing this still nonexistent repo exchange.   XP has failed to demonstrate that AVM's alleged conduct proximately caused ***any*** monetary loss.  *See Crowley Am. Transp., Inc. v. Richard Sewing Mach. Co.*, 172 F.3d 781, 784-85 (11th Cir. 1999) ("A party cannot recover damages for breach of contract unless it can prove that the damages were proximately caused by the breach.")

### III. Summary Judgment Should Be Granted Dismissing XP's Statutory Trade Secrets Claims Under DTSA and UTSA.

#### A. XP's DTSA Claim Is Barred Because the Alleged Misappropriation Pre-Dates the Effective Date of the Civil Penalty That Plaintiff Seeks.

In the first count of the Amended Complaint, Plaintiff seeks damages under the DTSA, which provides that "[a]n owner of a trade secret that is misappropriated may bring a civil action under this subsection if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."  18 U.S.C. § 1836(b)(1).

The DTSA does not apply retroactively to misappropriations that took place prior to its May 11, 2016 effective date.  Before that date, the statutory provisions at issue, then known as the Economic Espionage Act, only allowed the Attorney General to bring a civil action.  *See* Pub. L. No. 104-294, § 101, 110 Stat. 3488 (1996).  When signed into law, the DTSA established a private right of action.  *See* Pub. L. No. 114-153, § 2, 130 Stat. 376 (2016); *see also* S. Rep. No. 114-220, at 3 (2016) (Judiciary Comm. Rep.)[3] (explaining that DTSA amended existing law "to provide a Federal civil remedy for the misappropriation of trade secrets").  The DTSA contains an express temporal limitation stating that "[t]he amendments made by this section shall apply with respect to any misappropriation of a trade secret . . . for which any act occurs on or after the date of the enactment of this Act."  Pub. L. No. 114-153, § 2(e), 130 Stat. at 381-82; *see also De Sandoval v.*

---

[3] https://www.congress.gov/114/crpt/srpt220/CRPT-114srpt220.pdf.

*Attorney General*, 440 F.3d 1276, 1283 (11th Cir. 2006) (holding that courts will defer to the retroactivity provisions that "Congress has expressly prescribed" (quoting *Landgraf v. USI Fil Prods.*, 511 U.S. 244, 280 (1994))).  Thus, a private right of action under the DTSA can only be brought for a misappropriation occurring on or after the DTSA's May 11, 2016 effective date.

The DTSA defines a misappropriation as the "***acquisition*** of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or "***disclosure or use*** of a trade secret of another without express or implied consent." 18 U.S.C. § 1839(5) (emphases added).  XP disclosed the alleged trade secrets at issue in this litigation to AVM over ***seven years*** before the effective date of the DTSA, and there exists no evidence that AVM disclosed or used those supposed trade secrets at any time, let alone after May 11, 2016.  *See Hydrogen Master Rights, Ltd. v. Weston*, 228 F. Supp. 3d 320, 338 (D. Del. 2017) ("a plaintiff states a plausible claim for relief [under the DTSA] only if it 'sufficiently alleges a prohibited 'act' occurring after May 11, 2016" (quoting *Adams Arms, LLC*, 2016 WL 5391394, at *6)); *Avago Techs. U.S. Inc. v. Nanoprecision Prods., Inc.*, No. 16-3737, 2017 WL 412524, at *9 (N.D. Cal. Jan. 31, 2017) ("[s]imply alleging that the same information was disclosed 'again' [after the DTSA effective date] is not sufficient").

There is no evidence of any misappropriation whatsoever, and there is certainly no evidence of a misappropriation that first occurred after May 11, 2016.  For this reason, summary judgment must be granted against XP's claim under the DTSA.

### B. XP's DTSA and UTSA Claims Fail Because XP Cannot Demonstrate That It Possessed Any Trade Secrets.

The DTSA and UTSA contain functionally identical definitions of a trade secret.  The DTSA defines a trade secret as information that "the owner thereof has taken reasonable measures to keep . . . secret" and that "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." *M.C. Dean, Inc. v. City of Miami Beach, Fla.*, 199 F. Supp. 3d 1349, 1353 (S.D. Fla. 2016) (quoting 18 U.S.C.

§ 1839(3)).  Similarly, a trade secret under the UTSA is information that "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy" and that "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." *Id.* (quoting Fla. Stat. § 688.002).

Again, as an initial matter, Plaintiff has failed to rebut Mr. Friedman's report in which he concluded that each of the ideas he analyzed "does not contain a formula, pattern, compilation, program, device, method, technique, or process, or financial, technical, business, or economic information that, in my opinion, derives economic value from not being generally known [and, t]o the contrary, XP's [ideas are] uninformed and not proprietary or viable."  (Ex. QQ at 19, 24, 27, 30, 32.)  For this reason alone, Plaintiff's DTSA and USTA claims fail.

Setting that fatal flaw aside, Plaintiff's core premise in this case is that a person with nothing more than a whimsical idea for features of a repo exchange, who has no experience in repos, or securities exchanges, or programming, or software development, or SEC regulations, and with no funding, no investment of his own capital, no evidence of any research, analysis, viability studies, or economic modeling, no commitments from (let alone *bona fide* contact with) the insurers, factors, or rating agencies integral to his plan, and no process, algorithm or formula—to name a few lacking items—possesses a trade secret.  That is not the law.  XP's unformed ideas are not trade secrets under any sense of the term.  *See, e.g.*, *Myerburg v. Medtronic, Inc.*, No. 03-20616, 2004 WL 5622263, at *4-5 (S.D. Fla. Sep. 28, 2004) (granting summary judgment based on a finding, as a matter of law, that plaintiff's business strategy did not qualify as a trade secret under the UTSA, because "[t]aking the facts as presented, in the light most favorable to Plaintiff," its proposal "was not a new or novel idea, and was already known to Defendant before Plaintiff's presentation"); *EarthCam, Inc. v. OxBlue Corp.*, 49 F. Supp. 3d 1210, 1229-30 (N.D. Ga. 2014) (plaintiff "fundamentally failed to meet its statutory burden under the Georgia Trade Secrets Act to plead and prove" that supposed trade secrets had economic value due to secrecy or that defendant used its trade secrets because plaintiff only supported its claims with "belief and conclusory

allegations," which were "insufficient to survive summary judgment").

Furthermore, far from keeping his so-called ideas secret, Carbonella shared aspects of such ideas with an insurance company he thinks is named Euler, an insurance broker named Crystal, a person at Moody's, the so-called programmers he sought out, various acquaintances who worked on Wall Street and "cash" and "collateral" providers—***with no*** confidentiality agreements in place. (Ex. K (Carbonella Dep.) at 388:20-393:1.)  He also shared details of his ideas with "Frank," who supposedly had a commodities platform, with whom Carbonella says XP had a now-missing confidentiality agreement.  (*Id.* 329:20-330:2, 350:5-8.)  And he testified to have authorized AVM to discuss the ideas with its end users.  (SOMF ¶ 36.)  Plaintiff does not come close to the requisite level of secrecy required by law to maintain a trade secret.  S*ee Mortgage Now, Inc. v. Stone*, No. 09-80, 2009 WL 4262877, at *4 (N.D. Fla. Nov. 24, 2009) ("The plaintiff in a trade secret action bears the burden of demonstrating that it has taken reasonable steps to protect the secrecy of information it claims is protected by the FUTSA.").  XP's abdication of its burden to demonstrate that its "ideas" constitute a trade secret warrants a grant of summary judgment.[4]

### C. XP's DTSA and UTSA Claims Also Fail Because AVM Did Not Misappropriate Any So-Called Trade Secrets Belonging to XP and XP Did Not Suffer Any Damages As a Result of Any Misappropriation.

Finally, and in the alternative, to establish liability under either the DTSA or UTSA, XP must prove "an act of misappropriation."  *M.C. Dean, Inc.*, 199 F. Supp. 3d at 1353.  As pertinent here, the definition of "misappropriation" is essentially identical in both the DTSA and the UTSA: the "disclosure or use of a trade secret of another without express or implied consent by a person who . . . at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret."  18 U.S.C. § 1839(5)(B)(ii)(II); *see also* Fla. Stat. § 688.002(2)(b) (defining misappropriation as "[d]isclosure or use of a trade secret of another without express or implied consent by a person who . . . [a]t the time of disclosure or use, knew or

---

[4] AVM also reserves its right to seek its legal fees and costs in accordance with the DTSA and UTSA.  *See* 18 U.S.C. § 1836(b)(3)(D); Fla. Stat. § 688.005.

had reason to know that her or his knowledge of the trade secret was . . . [a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use").

For the same reasons that Plaintiff's breach of contract claim must fail, *see supra* Part II.A, there is no basis for finding a misappropriation under either the DTSA or UTSA.  Indeed, the Agreement is the only "circumstance[] giving rise to a duty to maintain" the "secrecy" of or to "limit [the] use" of anything disclosed by XP to AVM.  Otherwise, AVM and XP would have been nothing but arm's length entities without any expectation of privacy.  Therefore, just as XP has failed to demonstrate that AVM breached the Agreement, it has failed to demonstrate a misappropriation within the meaning of the DTSA or UTSA.  And for the same reasons set forth *supra* Part II.B, XP has failed to demonstrate any evidence that it suffered damages due to the supposed misappropriation.  *See Alphamed Pharms. Corp. v. Arriva Pharms., Inc.*, 432 F. Supp. 2d 1319, 1338 (S.D. Fla. 2006) (plaintiff must demonstrate actual damages to sustain UTSA claim; no nominal damages award permissible).

## IV.  Summary Judgment Should Be Granted Dismissing XP's Claim for Fraud By Omission.

The final remaining count of XP's Amended Complaint is for fraudulent concealment. Under Florida law, "a claim for fraudulent concealment is the same as one for fraudulent misrepresentation."  *Dugas v. 3M Co.*, 101 F. Supp. 3d 1246, 1253 (M.D. Fla. 2015).   Such a claim requires a plaintiff to prove four elements: "[1] the [defendant] concealed or failed to disclose a material fact; [2] the [defendant] knew or should have known the material fact should be disclosed; [3] the [defendant] knew [its] concealment of or failure to disclose the material fact would induce the plaintiffs to act; [4] the [defendants] had a duty to disclose the material fact; and [5] the plaintiffs detrimentally relied on the misinformation."  *Aprigliano v. Am. Honda Motor Co., Inc.*, 979 F. Supp. 2d 1331, 1342 (S.D. Fla. 2013) (quoting *Philip Morris USA, Inc. v. Hess*, 95 So. 3d 254, 259 (Fla. 4th DCA 2012)); *see also Dugas*, 101 F. Supp. 3d at 1254 (same).

As this Court held in its Order of September 2016, the Florida Supreme Court's decision in *Tiara Condo Ass'n, Inc. v. Marsh & McLennan Companies, Inc.*, 110 So. 3d 399 (Fla. 2013), "'did

not upset 'fundamental contract principles' which continue to delineate the general boundary between contract law and tort law regardless of the breadth of the economic loss doctrine.'" (ECF No. 37 at 9 (citations omitted).)   In its subsequent decision on AVM's motion to dismiss the Amended Complaint, this Court substantially narrowed Plaintiff's fraud claims, but found that Plaintiff adequately alleged "certainly omissions" that may be actionable—"namely, Defendant's alleged failure to notify Plaintiff that following their January 29, 2009 meeting Defendant disclosed Plaintiff's confidential information during several meetings with other institutions." (ECF No. 56, at 13 (citing Am. Compl. ¶¶ 131-32, 135).)

Like the other allegations in the Amended Complaint, every aspect of Plaintiff's fraud by omission assertion is false.   This claim fails like the others, because there was no disclosure or utilization by AVM of XP's ideas; XP's ideas were uniformed and not viable or proprietary (per the unrefuted opinions of Mr. Friedman).   And again, as discussed *supra* Part II.A, there is not one instance in the nearly 100,000 pages of documents that have been produced in discovery in which any AVM employee disclosed any of XP's ideas (which AVM had internally determined made no sense) to any third party.   Nor have any of the ten fact witnesses deposed in this matter identified any instance of an XP idea being disclosed to a third party.   (*See* SOMF ¶¶ 43-47, 52.)   Thus, AVM never concealed any discussions with third parties about XP's ideas because no such discussions took place.

Furthermore, in stark contrast to the assertions in the Amended Complaint, Carbonella testified that, following his meeting with Messrs. Kidwell and Doyle, he expected they would (and he authorized them to) speak with their clients and market contacts about the viability of XP's concepts.   (SOMF ¶ 36.)   Specifically, Carbonella said he expected that Messrs. Kidwell and Doyle "would speak to their clients about these ideas to see how they would take to it" and "[t]o see if they would see the vision and accept what we were about to create the same way we saw it and we knew that to be the future."   (SOMF ¶ 36.)   He further testified that he had a "verbal agreement" with Messrs. Kidwell and Doyle "that they may speak to the end users to get feedback on, you know, their opinions."   (SOMF ¶ 36.)   In fact, not only did Carbonella admit that he made

this agreement, but when asked whether he knew that AVM was talking to NYSE about a repo exchange, he responded: "After the meeting, I had some conversations with Jeff and he did bring up [NYSE], [BNY], a number of different companies, which I believed to be part of what we discussed, not something that they had going on independent and separate of what I discussed with them." (SOMF ¶ 36 (quoting Ex. K (XP/Carbonella Dep.) 359:14-23).)

Of course, the Agreement by no means imposes exclusivity as to any party, it simply prohibits unauthorized disclosure or utilization of the other's protected Information. And while Messrs. Kidwell and Doyle never actually spoke with BNY or NYSE (or any other third party) about Plaintiff's ideas, Carbonella's admission that he expected and authorized them *to do exactly that* categorically negates a fraud by omission claim. Plaintiff cannot satisfy the elements of concealment, materiality, or reliance. Likewise, for the same reasons its damages assertions fail as to its contract and trade secret claims, Plaintiff has suffered no damages attributed to a purported fraudulent concealment. *Minotty v. Baudo*, 42 So. 3d 824, 835 (Fla. 4th DCA 2010) ("to prevail in an action for fraud, a plaintiff must prove its actual loss or injury from acting in reliance on the false representation" (quoting *Morgan Stanley & Co. v. Coleman (Parent) Holdings, Inc.*, 955 So. 2d 1124, 1132 (Fla. 4th DCA 2007))).

Moreover, XP was surely aware by mid-April 2009 when AVM stopped responding to Carbonella's emails nearly three months after XP's meeting with AVM, that AVM was not going to further engage with XP. (SOMF ¶ 47.) And, yet, after he expressed his erroneous suspicion on April 14, 2009 that AVM was disclosing or utilizing his ideas, he sat idly for the next five years while XP was sent 253 AVM Repo Commentaries—144 of which led directly to AVM RPX. (SOMF ¶ 48.) Thus, setting all of the fatal flaws above aside, the notion that AVM fraudulently omitted the existence of meetings "to prevent [XP] from pursuing use of its own ideas and acting to enforce its rights under the Agreement" is entirely untenable. To the contrary, XP did nothing after meeting with AVM to otherwise pursue its supposedly "revolutionary" ideas because the indisputable record shows those ideas were a lark.

Finally, as purely legal matter, the Agreement contains an express obligation of the parties

that renders a fraudulent concealment claim duplicative of XP's contract claim, since the Agreement specifically requires that each party "will immediately notify the other party of any unauthorized use or disclosure of the Information of which they become aware and they will make all reasonable efforts to prevent and stop such unauthorized use." (Ex. S.) This mutual notification requirement precludes a fraud by omission claim, because any alleged silence by AVM in the face of disclosure or utilization was contractually prohibited. Thus, any resulting harm to XP is a breach of contract not tort—and, thus, allowing the latter would run afoul of the "general boundary between contract law and tort law." (*See* ECF No. 37 at 9.)

Unlike a pre-contractual fraudulent inducement, which can stand alongside a contract claim, this is purely a matter of contract, not tort. Indeed, if there were a tort here, there could be also be tort in virtually any breach of a confidentiality agreement, since the very premise of all such contracts is non-disclosure. For this reason, AVM submits that the Court's application at the pleadings stage of the concepts of fraudulent inducement to this claim, as set forth in *HGI Associates, Inc. v. Wetmore Printing Co.*, 427 F.3d 867, 876 (11th Cir. 2005) and *HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.*, 685 So. 2d 1238, 1239 (Fla. 1996) (*see* ECF No. 56 at 13-14), need not be revisited because Plaintiff's fraud by omission claim fails for the multitude of reasons set for above, but certainly can be revisited on a summary judgment record.

## <u>CONCLUSION</u>

For the forgoing reasons, AMV respectfully requests that summary judgment be granted and that the Amended Complaint be dismissed in its entirety with prejudice.

Respectfully submitted,

s/ Michael R. Tein
Michael R. Tein
mtein@lewistein.com
Fla. Bar No. 993522
LEWIS TEIN PL
3059 Grand Avenue, Ste. 340
Coconut Grove, Florida 33133
(305) 442-1101 (phone)
(305) 442-6744 (fax)

Zachary D. Rosenbaum
zrosenbaum@lowenstein.com
*Admitted pro hac vice*
Joseph A. Fischetti
jfischetti@lowenstein.com
*Admitted pro hac vice*
LOWENSTEIN SANDLER LLP
1251 Avenue of the Americas
New York, New York 10020
(212) 262-6700 (phone)
(212) 262-7402 (fax)

*Attorneys for Defendant*

## REQUEST FOR HEARING

Given the dispositive and significant issues presented in this motion, AVM believes the motion warrants 60 minutes of oral argument.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 3, 2017, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

s/ Michael R. Tein
MICHAEL R. TEIN