**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No.  16-cv-80905-BB**

XP GLOBAL, INC.,

      Plaintiff,

v.

AVM, L.P.,

      Defendant.

_____/

**ORDER ON PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**
**AND DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**THIS CAUSE** is before the Court upon Plaintiff's Motion for Partial Summary Judgment, ECF No. [94],  and Defendant's Motion for Summary Judgment, ECF No. [99]. Both motions are ripe for review.  The Court has reviewed the motions, all supporting and opposing submissions, the record and applicable law, and is otherwise fully advised.  For the reasons that follow, Defendant's motion is granted.

**I.     BACKGROUND**

In support of their respective motions for summary judgment, both parties have submitted statements of material facts, ECF Nos. [95] and [104–1], and opposing statements of material facts, ECF Nos. [109] and [112].[1]  Based on these statements, as well as the evidence in the record, the following facts are not genuinely in dispute unless otherwise noted.

XP Global, Inc. ("Plaintiff") is a non-operational New York corporation formed in 2004. *See* ECF No. [104–1], at ¶ 2.  Its principal is  Michael Carbonella.  *See Id*.  The company, which has not generated revenue in at least a decade, has never issued a Form W-2 to any employee or

---

[1] In further support of its motion for summary judgment, Defendant also filed a response to Plaintiff's additional material facts.  *See* ECF No. [125–2].

a Form 1099 to any independent contractor.  *See Id.*  AVM, L.P. ("AVM" or "Defendant") is a

registered broker-dealer based in South Florida that brokers trades in debt instruments,

derivatives, and repurchase agreements, or "repos."[2]  *See Id.* at ¶¶ 1, 3.

Shortly after he started working at AVM, L.P. in April 2008,  Jeffrey Kidwell[3] began

working on a concept called "Direct Repo" as a result of the then-evolving financial crisis.  *See

Id.* at ¶¶ 6–7.  The objective of Direct Repo "was . . . and remains today, to pair collateral

providers (borrowers) and cash providers (lenders) in a direct transaction with no dealer in the

middle."[4]  *Id.* at ¶ 7.  In or about the summer of 2008, AVM senior personnel began discussing,

in general terms, the concept of an electronic exchange on which repos could be traded.  *See Id.*

at ¶ 8.  Among those involved in the discussions were Messrs. Kidwell, then-Chief Executive

Officer William McCauley, and then-Head of Financing Patrick Doyle.[5]  *See Id.*

Kidwell testified that he initially perceived the repo exchange idea as "an electronic

trading platform, an exchange where people could trade cash collateral to collateral non-over-

the-counter".  *See Id.* at ¶ 16; *see also* ECF No. [104–4], at 7–8.  Nevertheless, according to

Messrs. Kidwell and McCauley, the concept "quickly morphed into . . . something much more

complex," ECF No. [104–4], at 7, involving "a centralized counterparty [with] the

creditworthiness to attract the users onto that platform" and that faced "each of the users of the

---

[2] A repo "is an agreement involving the simultaneous sale and future repurchase of an asset.  In a typical repurchase agreement, the original seller buys back the asset at the same price at which he sold it, with the original seller paying the original buyer interest on the implicit loan created by the transaction." *Capital Mgmt. Select Fund Ltd. v. Bennett*, 680 F.3d 214, 221 n.5 (2d Cir. 2012).

[3] Kidwell previously was co-head of the global repo desk at Cantor Fitzgerald, a repo dealer, and head of Morgan Stanley's North American repo division.  *See* ECF No. [104–1], at ¶ 6.

[4] In a typical repo transaction, the collateral provider/borrower and cash provider/lender transact indirectly through a dealer, who "serves as a market-making 'principal' and thus 'faces' each side of the transaction as the borrower's and lender's counterparty."  *See* ECF No. [104–1], at ¶ 5.  The involvement of the dealer middleman in the matching of the lender and borrower is a form of what is called "intermediation."  *See Id.*

[5] McCauley has spent most of his career in investment banking, while  Doyle has spent his entire career working in repo markets for J.P. Morgan and Sumitomo Bank Securities, among others.  *See Id.* at ¶ 8.

platform in [the] financial transaction," ECF No. [104–2], at 14.

By October 2008, AVM senior personnel were discussing the development of a repo exchange verbally and in writing with various third parties.  *See* ECF No. [104–1], at ¶¶ 15, 18; *see also* ECF No. [101–3] (October 17, 2008 email from  Doyle to Convexity Capital Management stating that AVM "foresee[s] the creation of an exchange as being the end game of the Direct Repo concept"); ECF No. [101–4] (October 20, 2008 email from  Doyle to the Federal Reserve Bank of New York stating that "a 'repo exchange' . . . is a natural evolution of the Direct Repo concept"); ECF No. [101–5] (October 20, 2008 email from  Doyle asking  Kidwell to forward a piece including "a suggestion along the lines of a repo exchange that we have suggested in the past"); ECF No. [101–6] (October 22, 2008 email from  Kidwell to the Bank of New York Mellon stating "[AVM] have decided to take the discussion a step further or to the next evolutionary step and have engaged some of the clearing houses, vendors, and the Federal Reserve about a market-wide Repo Exchange (Repo Depot?) which could facilitate Direct Repo"); ECF No. [101–9] (October 22, 2008 calendar invitation from  McCauley to the New York Stock Exchange bearing "Repo Exchange ideas" subject line); ECF No. [104–9] (October 22, 2008 email from  Kidwell to Victory Capital Management stating "[y]ou could be a collateral provider and a cash provider.  Particularly, if I get this Repo Exchange (Repo Depot) up and running soon"); ECF No. [104–14] (October 23, 2008 emails from  Kidwell to RBSGC stating "I have also been spending a lot of time/energy on brainstorming a new Repo Exchange (Repo Depot) to facilitate Direct Repo and to involve the Fed" and "my idea is to run a Repo exchange (Repo Depot or RPX)"); ECF No. [104–5] (October 27, 2008 email from  Doyle to the New York Stock Exchange stating that "[ Doyle] would like to follow up with you on the repo exchange idea" and "[i]n the meantime we've spoken to Tradeweb about our 'Direct Repo'

concept, which is a precursor to the exchange"); ECF No. [101–24]  (October 29, 2008 internal AVM Outlook invitation for meeting with TradeWeb "to discuss a front end platform for a repo exchange"); ECF No. [104–18] (October  31, 2008 email from  Kidwell to the New York Stock Exchange stating "[o]ur project, RPX (Repo Exchange), has a broader scope"); ECF No. [104–20] (November 2, 2008 email from  Kidwell to the Federal Reserve Bank of New York stating that "I am pleased that there is interest in the public exchange (I like to call RPX or REPO EXCHANGE) that we have been working on"); ECF No. [101–23] (December 5, 2008 email from  Kidwell to Bloomberg stating "I wanted to give you an update on Direct Repo, which . . . is the product I am spear-heading (along with the one to follow, a public Repo Exchange-RPX)").

In December 2008, Defendant prepared the prototype webpage for "AVM RPX."  *See* ECF No. [104–1], at ¶ 19.  When it went live on January 12, 2009, AVM RPX was not a securities exchange, but rather a manually-updated informational webpage where Defendant would post rates for Direct Repo for its clients to see.  *See Id*.  Clients could then call Defendant and do over-the-counter trades.  *See Id*.  AVM RPX was not capable of executing trades electronically; instead, "once parties saw rates in which they might be interested, they would have to contact  Kidwell, who would facilitate the transaction as an introducing broker for a fee." *See Id*.  Defendant hoped that AVM RPX would someday evolve into an exchange; however, this never occurred.  *See Id*.  Although Defendant later re-branded AVM RPX as "AVM DRX," DRX has retained the same functionality to this date as RPX—that is, AVM DRX is not now and never was a repo exchange.  *See Id*.

Carbonella met  Kidwell and his wife, Michelle Kidwell, when the Kidwells retained him as a real estate broker while looking for an apartment in Manhattan in 2007.  *See Id*. at ¶ 12.

The Kidwells later moved into an apartment in the same building where  Carbonella worked and lived.[6]  *See Id.*   Carbonella had reached out to  Kidwell at least twice in 2008 to pitch business; "once in an effort to gauge AVM's interest in pools of foreclosed residential real estate and another to pitch a trade involving gold."  *See Id.* at ¶ 9.  On January 16, 2009,  Carbonella emailed  Kidwell, telling him that the previous week he had read  Kidwell's October 7, 2008 letter to the Federal Reserve Bank of New York ("FRB").[7]  *See Id.* at ¶ 20.   Carbonella explained that after speaking to Ms. Kidwell about the letter and then having a "Brain Storm," he "believe[d] there may be a way to execute your Repo Exchange idea without having to utilize the [FRB] which could take forever for approval. . . . Great Idea by the way."  *Id.*; *see also* ECF No. [101–10].

On January 19, 2009,  Kidwell and  Carbonella met for lunch in New York.  *See* ECF No. [104–1], at ¶ 21.   Carbonella testified that at the lunch he and  Kidwell discussed "a number of issues," and while he could not recall "[e]xactly what" was discussed, he did not share "whatever I felt my core strengths or ideas were."  ECF No. [101–8], at 35.  In an email  Kidwell sent to Defendant's accounting department on January 20, 2009, regarding his expense report for the trip, he stated that he "met with XP Global Inc. yesterday to discuss AVM RPX and a trading network solution for our Repo Exchange."  ECF No. [101–27].

Also on January 19, 2009,  Carbonella sent a letter to  Kidwell entitled "Proposal for 'New Alternatives for Funding Collateral.'"   *See* ECF No. [101–11].  The letter was sent in response to the letter  Kidwell sent to the FRB on October 7, 2008.  *See Id.*   Carbonella's letter proceeded to reference fourteen ways "[o]n top of the Idea's [sic] [ Kidwell] already presented in

---

[6]  Carbonella's studio apartment was also Plaintiff's business address.  *See* ECF No. [104–1], at ¶ 2.
[7]  On October 7, 2008,  Kidwell sent a letter on behalf of Defendant to Timothy Geithner, then-President of the FRB, and Neel Kashkari, then-Interim Assistant Secretary of the Treasury for Financial Stability. *See* ECF No. [104–1], at ¶ 14.  The letter, entitled "New Alternatives for Funding Collateral at the Federal Reserve," set forth proposals to provide relief and liquidity to repo markets.  *See Id.*

the [October 7, 2008] Letter," that Plaintiff could help Defendant accomplish its idea.  *Id*.  The proposals included the ability to offer, among other things, "[a] Trading Platform (Using the same programmers who created Deutsche Banks [sic] Bond Trading Platforms" and "[a] Brand New Futuristic Exchange (NASDAQ to stocks, is US to REPO's)."  *Id*.  The letter further explained Plaintiff could accomplish the fourteen objectives by replacing the Federal Reserve in Kidwell's concepts with "world wide, world known 'INSURERS' – A platform already exists similar to this and only needs modification," and that Plaintiff had already "contacted the existing Platform creators and they are excited and willing to come on board and create this new Exchange for us."  *Id*.

Neither Plaintiff nor  Carbonella, however, had (or have) any "experience trading repos or doing business with repos[,] . . . in software development or computer programming, building an exchange platform for securities, or trading on or interfacing with a securities exchange."  *See* ECF No [104–1], at ¶ 11.

Nevertheless, based on the representations in the lunch meeting and letter,  Kidwell invited  Carbonella to make an in-person presentation to Defendant regarding Plaintiff's proposals.  *See Id*. at ¶ 23.   Kidwell testified that:

> I took the meeting to hear him out, especially since he mentioned something about
> a technology company and an exchange, which caught my attention. . . . [I]t was
> my belief that we might need an exchange or . . . existing exchange, hence why
> we spoke to New York Stock Exchange and OCC and CME prior to that.  And it
> was my thought that maybe we needed somebody who was good at programming
> who could program the front side of a trading platform.  So that interested me.  I
> didn't vet it.  I didn't know that he actually had that.  So I listened.

ECF No. [104–4], at 40.  In anticipation of the presentation, the parties discussed terms for a confidentiality agreement.   *See* ECF No. [104–1], at ¶ 24.   While discussing those terms, Carbonella emailed  Kidwell on January 27, 2009, and stated that his "attorneys . . . see [Plaintiff

and Defendant] as 'Partners' in a business venture" and "[Defendant] as a Client to [Plaintiff]

utilizing [Plaintiff's] Broker Services."   ECF No. [101–13].   At his deposition,  Carbonella

admitted that Plaintiff had no brokerage service and that he did not actually hire any attorneys,

but may have used an attorney friend.   ECF No. [101–8], at 45–46.   The same day  Kidwell

responded that he sees Plaintiff as:

> [A]n advisor/consultant/resource for the creation of my Repo Exchange.   You
> have advice and ideas about how we could better construct my Repo Exchange
> and have the programming contacts to deliver an electronic interface for the Repo
> Exchange.   I am very sensitive to who came up with the idea and to how many
> people will attempt to take credit and a share of the pie.

ECF No. [101–13].   Carbonella did not respond to this email.   On January 29, 2009, Defendant's

then-General Counsel, Scott Wyler, sent  Kidwell an email observing that "[l]ooking at the list in

[Plaintiff's] letter to you dated January 19, most of the things listed strike me as clearly not

unique/non-proprietary" and "should not be considered Confidential Information."   ECF No.

[101–14].   Wyler also observed that "[t]here are several others that similarly are already part of

RPX's design and/or plan or that are just details that have not yet been delineated."   *Id*. Plaintiff

did not disagree with  Wyler's observations.   *See* ECF No. [101–8], at 48.

The meeting between the parties took place on January 30, 2009.   *See* ECF No. [104–1],

at ¶ 27.   On the day of the meeting, the parties executed a "Mutual Confidentiality Agreement"

(the "Agreement"), dated January 29, 2009, with  Wyler signing for Defendant and  Carbonella

signing for Plaintiff.   *See Id*.   Messrs. Kidwell and Doyle attended the meeting for Defendant,

with  McCauley attending briefly.   *See Id*. at ¶ 28.   The "Goal of [the] Presentation" as described

in  Carbonella's written slide deck was "[T]o Present the Qualifications and Ability XP Global

Inc. and its Talented Team of Programmers possess and why we are the only possible choice for

this 24/7 Platform Solution[.]"   ECF No. [104–7], at 6.

Plaintiff, however, did not have a "Team of Programmers," or any other technology-oriented individuals, in its employ.  *See* ECF No. [104–1], at ¶ 29.   Carbonella testified that he spoke with programmers who were ready to join Plaintiff, but that he could not remember the names of any of the programmers that he allegedly spoke with or how to get in touch with them.  *See* ECF No. [101–8], at 31, 103.    Carbonella does remember speaking to an unnamed programmer from Deutsche Bank who "loved the idea of creating an exchange and . . . was ready to jump ship . . . ."  *See Id*. at 31.   Carbonella stated that he "did not tell" these unnamed programmers "in-depth things about the exchange," that he did not enter into any written contracts or confidentiality agreements with them, and that he destroyed or lost any written communications with the programmers.  *Id*. at 31, 67–68, 103.

The presentation also referenced "4 Levels of Payment Security," including "Pre Registration/ Pre Qualification," "Rating Agency," "Insurance/Indemnifyers [sic]," and "Factor."  ECF No. [104–7], at 18.   Plaintiff would have been reliant on Defendant to develop pre-registration and pre-qualification procedures.   *See* ECF No. [101–8], at 59–60.   Regarding interest shown by insurance, indemnifiers, rating agencies, and factors in Plaintiff's idea, Carbonella testified that in and around January 2009, he spoke: (1) with someone from Moody's (the rating agency), who told him that Moody's might be interested in rating securities on an exchange, *see* ECF No. [108–1], at 145–46; (2) with someone at Euler and someone named "Duncan" at Frank Crystal & Company, both insurers, *see Id*. at 141–44; and with someone named "Frank,"[8] who owned a (unrelated) factoring company called XP Capital, *see Id*. at 158–59.   Other than a non-disclosure agreement Plaintiff signed with Frank, which has not been produced, Plaintiff did not enter into any type of agreement with whom the individuals

---

[8]  Carbonella testified that he "was probably talking to [Frank] in November or December of '08."  *See* ECF No. [101–8], at 43.

Carbonella spoke, nor did Plaintiff or  Carbonella keep any records of meetings or any written communications between themselves and these parties.  *See* ECF No. [101–8], at 67–68; *see also* ECF No. [108–1], at 146, 159.

Additionally, the presentation referenced a "current" trading platform that could be modified to build the repo exchange.  *See* ECF No. [104–1] at ¶ 33; *see also* ECF No. [104–7], at 36.  Carbonella testified that the platform was a "factoring platform . . . used in commodities . . . for like bananas and stuff like that."  *See* ECF No. [104–1] at ¶ 33.   Carbonella stated that he learned of this platform from Frank from XP Capital, who built it.  *See Id*.  Plaintiff, however, has produced no communications with Frank nor any other evidence whatsoever identifying or describing the platform referenced in the presentation.

The presentation ended by touting "[Plaintiff]'s Team Experience" with "Over 75 years of combined Financial, and Information Technology Executive Level Experience in Fortune 500 Corporations . . . ."  ECF No. [104–7], at 55.  Plaintiff's "team," however, did not possess such experience or qualifications.  *See* ECF No. [104–1], at ¶ 34; *see also* ECF No. [101–8], at 61–66.  Rather,  Carbonella testified that the team he was going to put together—including the unnamed programmer from Deutsch Bank and Frank, among others—would have had that level of experience.  *See* ECF No. [101–8], at 61–66.

Following the meeting, Carbonella testified that he believed that Messrs. Kidwell and Doyle "would speak to their clients about [Plaintiff's] ideas to see how they would take to it."  *Id*. at 71.  He also said he had a "verbal agreement" with them "that they may speak to the end users to get feedback on, you know, their opinions."  *Id*. at 76.  In addition,  Carbonella stated that while he did not know prior to his meeting with Defendant that  Kidwell had been speaking to the New York Stock Exchange ("NYSE"), he became aware because "[a]fter the meeting, I

had some conversations with [ Kidwell] and he did bring up [NYSE], the Bank of New York, a number of different companies, which I believed to be part of what we discussed . . . ."  *See Id*. at 57.

On February 10, 2009, Carbonella emailed  Kidwell as a follow-up to the January 30 meeting.  *See* ECF No. [104–1], at ¶ 39.   Kidwell responded to Carbonella, stating that Defendant "had a number of external meetings this week on AVM RPX with others and a couple of internal meetings digesting our options.  We are weighing the pros and cons of each and filling in some of the blanks we had."  ECF No. [101–29].  Carbonella responded that he "wish[ed] you had different news at this point since we are holding many entities back."  *Id*.  Kidwell forwarded this email within AVM, including to  McCauley, who asked whether Carbonella's response was "threatening to take some of our intellectual property and use it elsewhere?"  *Id*.  Kidwell stated that he did not know what  Carbonella meant, but that he agreed that  Carbonella's email was "troubling."  *Id*.

On February 11, 2009,  Kidwell emailed a spreadsheet to Defendant's internal working group summarizing Defendant's various efforts and discussions around "the electronic delivery of AVM RPX or something akin to it."  ECF No. [104–17].  The spreadsheet identified eight "Options" labeled "A" to "H" that Defendant was considering, along with benefits, drawbacks, and other details regarding each option.  *Id*.  The information in the spreadsheet had not been vetted or tested by Kidwell or Defendant; rather, it was based on the information that had been presented to AVM by the other party.[9]  *See* ECF No. [104–1], at ¶ 40.  Plaintiff's proposal was listed as Option C.  *See Id*.   Wyler responded to the email by asking for input from Paul

---

[9] For instance,  Paul Algreen testified that before any technology provider could be selected for what was described in  Kidwell's spreadsheet as the front office interface (or application), Defendant's technology team would have performed extensive due diligence regarding the technology provider's qualifications, including "understanding what their capabilities are, usually demos [of their technology] or discussing what their technology stack looks like."  ECF No. [104–1], at ¶ 42.

Algreen, who was Defendant's Chief Technology Officer at the time.[10]  *See Id.*

Relating to Plaintiff's proposal under Option C, Algreen stated to the group that he failed "to see the advantage of partnering with [Plaintiff] besides their vision, but honestly, I'm not sure I fully understand their strategy.  In any case, unless they have tangible relationships and/or tangible technology (pre-existing software) I'm not sure we aren't better off sub-contracting out this work rather than partnering."  *See Id.*  In response,  Kidwell stated:

> [Plaintiff] indicates that they do have existing technology to modify . . . and also programmers from the bond trading platform of Deutsche Bank.  Their unique idea of using insurance companies and factoring agents to guarantee or indemnify trades is intriguing, but a double-edged sword. . . .  It may do away with the need for a CCP [central counterparty].  However, it relies on existing relationships that [Plaintiff] has with those entities and it may be too different from what the overall repo market is used to or expecting as a solution.  The other variable with [Plaintiff] is how much revenue share they are looking for.

*Id.*  On February 18, 2009,  Kidwell sent  Carbonella an email stating that Defendant was "trying to figure out which path [to] take with the public repo exchange" and was having difficulty with the "lack of detail regarding [Plaintiff's] insurance company/factoring agent guarantees or indemnification of trades," which  Kidwell expressed might not be acceptable to Defendant's clients.  *Id.* at ¶ 43.  When  Kidwell circulated Carbonella's response internally, he expressed disagreement with some of  Carbonella's contentions because  Carbonella had "not checked with either cash providers or collateral providers," "the various levels of insurance, indemnification, and factoring . . . all comes at cost (a piece of the pie) for the customers and is different from their current Modus Operendi [sic]," and because  Carbonella's approach was "more complex than [their customers'] current process."  *Id.*

On February 26, 2009,  Carbonella emailed  Kidwell requesting another update.  *See Id.*

---

[10]  Algreen graduated from the Massachusetts Institute of Technology in 1997 with a degree in aerospace engineering and has worked both in technology and securities trading, including in the repo markets.  *See* ECF No. [104–1], at ¶ 40.

at ¶ 44.   Kidwell responded by asking   Carbonella for "more info on the insurance

company/factoring agent angle, so I could measure the receptiveness of cash providers to that."

*Id*.   Kidwell again circulated   Carbonella's response, prompting   McCauley to quip that "[t]his

guy sounds like a crackpot!", and   Algreen to respond, "putting it nicely."   *Id*.; *see also* ECF No.

[101–17].    Kidwell then responded: "Yes, he is irritating me now.   He is giving me no

information really and I can't help but bristle every time he makes a reference to what [Plaintiff]

is gonna do or that he is speaking to his cash providers/collateral providers.   He doesn't know

anyone in Repo, so he must be talking about commodities or foreign exchange or real estate."

ECF No. [104–1], at ¶ 44; *see also* ECF No. [101–17].

On April 14, 2009,  Carbonella emailed  Kidwell for the last time.  *See* ECF No. [104–1],

at ¶ 45.  In the email,  Carbonella wrote that he "heard from one of [his] associates the FDIC has

been approached to be a clearing house in a Repo Exchange" and hoped that Defendant was not

the party approaching the FDIC.   *Id*.; *see also* ECF No. [101–18].   At the end of the email,

Carbonella added: "It is interesting though because who ever [sic] it is is thinking along my ideas

which I presented to your firm, of INSURANCE . . . Hmmm . . ."  ECF No. [104–1], at ¶ 45; *see*

*also* ECF No. [101–18].   At his deposition,   Carbonella explained that by writing "Hmmm," it

was "me saying, is this you?"  ECF No. [101–8], at 83–84.

After  Kidwell circulated the email with the note "don't shoot the messenger,"  McCauley

responded: "He continues to sound unprofessional and shallow.  I'm not interested in partnering

with him unless someone makes a strong case."   ECF No. [104–1], at ¶ 46; *see also* ECF No.

[101–18].   Kidwell "agree[d].  The email in general was very unprofessional, self-promoting,

and maybe even a little insulting."  *Id*.

Carbonella's April 14, 2009 email was the last communication between Plaintiff and

Defendant until the commencement of this lawsuit over seven years later, in June 2016.  *See* ECF No. [104–1], at ¶ 47.  Plaintiff has not pursued its ideas for a repo exchange in any manner in the eight-plus years since  Carbonella's April 14, 2009 email.  *See Id*.  According to  Carbonella, the opportunity for Plaintiff to pursue its idea or partner with anyone else was lost "when [Defendant] misled [ Carbonella] to believe the idea was worthless . . . ."  ECF No. [108–1], at 140.

Between March 2009 and July 2014,  Kidwell sent at least 253 electronic communications to Plaintiff, entitled "AVM Repo Commentary," in which  Kidwell described his and Defendant's activities in the repo markets.  *See* ECF No. [104–1], at ¶ 48.  At least 144 of those Commentaries (including 107 commentaries from 2009) specifically referenced AVM RPX and how to access it.  *See Id*.

In the first half of 2009, Defendant continued its discussions and meetings with FRB, NYSE, and the Bank of New York Mellon ("BNYM") that began in October 2008, as well as with other entities including OCC and CME Group.  *See Id*. at ¶ 47.  Defendant entered into confidentiality agreements with BNY, NYSE, and CME concerning these discussions, dated November 3, 2008, March 23, 2009, and October 16, 2009, respectively.  *See Id*; *see also* ECF No. [104–16] (Confidentiality Agreement executed between Defendant and BNYM on November 4, 2008); ECF No. [104–10] (February 13, 2009 email from  Kidwell to CME Group stating "we think we have parallel paths that could really work together to provide a public repo exchange (we call AVM RPX at the moment)"); ECF No. [104–15] (March 23, 2009 email exchange between Defendant and NYSE regarding their Mutual Confidentiality Agreement); ECF No. [104–11] (March 24, 2009 email from  McCauley to NYSE and BNYM stating "[w]e are excited about trying to figure out how to satisfy the enormous demand we see for a repo

exchange"); ECF No. [104–19] (Confidentiality and Non-Disclosure Agreement between Defendant and CME Group executed on October 19, 2009); ECF No. [104–12] (October 20, 2009 email conversation between  Doyle and CME regarding the "viability of a public exchange" and their non-disclosure agreement); ECF No. [104–13] (December 29, 2011 email from  Kidwell to FRB commenting on a news article and stating "this sounds like a Repo Exchange, a public repo clearing facility, that [Defendant] spoke about with Dina and Debby in October 2008").

According to  McCauley, due to the "complexity of creating" a public repo exchange and its "very low probability of success," the development of Defendant's repo exchange never moved beyond the "conceptual level," ultimately becoming "[n]ot [a] very big" priority for Defendant.  ECF No. [104–2], at 33–34, 103.  Accordingly, AVM senior personnel, including Messrs. McCauley, Kidwell, Doyle, and Algreen testified that Defendant never developed any financial projections or performed any revenue analyses in connection with a repo exchange because the project never got to that point.  *See* ECF No. [104–1], at ¶ 53.  While Defendant has not entirely abandoned the idea of developing a repo exchange, Defendant has not launched such an exchange.  *See* ECF No. [108–1], at 15–16.  To date Defendant does not have and has never had a repo exchange.  *See* ECF No. [104–1], at ¶ 51.


## II.    LEGAL STANDARD

The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion.  *See Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005).  Under Federal Rule of Civil Procedure 56, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions

on file, together with the affidavits, if any, show that there is no genuine issue as to any material

fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322 (1986); *see also* Fed. R. Civ. Pro. 56(a).  The parties may support

their positions by citation to the record, including, *inter alia*, depositions, documents, affidavits,

or declarations.  *See* Fed. R. Civ. P. 56(c).  An issue is genuine if "a reasonable trier of fact could

return judgment for the non-moving party." *Miccosukee Tribe of Indians v. United States*, 516 F.

3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48

(1986)).  A fact is material if it "might affect the outcome of the suit under the governing law."

*Id.* (quoting *Anderson*, 477 U.S. at 247–48).

The moving party shoulders the initial burden to demonstrate the absence of a genuine

issue of material fact.  *See Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008).  A movant

must present evidence demonstrating that it can establish the basic elements of his claim.

*Celotex*, 477 U.S. at 322.  Once the moving party has met its burden, the non-movant must "go

beyond the pleadings" and show that there is a genuine issue for trial.  *Id.* at 324; *see also* Fed. R.

Civ. Pro. 56(c)(1).  The inferences to be drawn from the underlying facts must be viewed in the

light most favorable to the party opposing the motion.  *See Adickes v. S. H. Kress & Co.*, 398

U.S. 144, 158–59 (1970).  To avoid summary judgment, the nonmoving party "must do more

than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (emphasis added).  After the

nonmoving party has responded to the motion for summary judgment, a court must grant

summary judgment if there is no genuine issue of material fact and the moving party is entitled

to judgment as a matter of law.  Thus, "a 'judge's function' at summary judgment is not 'to

weigh the evidence and determine the truth of the matter but to determine whether there is a

genuine issue for trial.'"  *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam) (quoting *Anderson*, 477 U.S. at 249) (emphasis added).

As before the Court here, "cross motions for summary judgment may be probative of the nonexistence of a factual dispute, but this procedural posture does not automatically empower the court to dispense with the determination whether questions of material fact exist."  *Georgia State Conference of NAACP v. Fayette Cty. Bd. of Comm'rs*, 775 F.3d 1336, 1345–46 (11th Cir. 2015).  In particular, where "the parties respond[] to each respective summary judgment motion with disputes as to the 'undisputed' facts, add[] 'material facts' of their own, and then repl[y] with subsequent objections to the other party's additional facts," the mere filing of cross motions for summary judgment is not conclusive.  *Id*.  Thus, where the parties disagree as to the facts, summary judgment cannot be entered unless one of the parties meets its burden of demonstrating that "there is no dispute as to any material facts with the evidence and all inferences drawn therefrom viewed in the light most favorable" to the other party.  *Shook v. United States*, 713 F.2d 662, 665 (11th Cir. 1983).

## III.    DISCUSSION

Four causes of action remain in the present case: (1) breach of contract; (2) violation of the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq.*; (3) violation of Florida's Uniform Trade Secrets Act ("FUTSA"), Fla. Stat. § 688.01, *et seq.*, and (4) fraudulent omission.  Plaintiff has moved for partial summary judgment on the entirety of its breach of contract claim, on two elements of its FUTSA claim,[11] and several of Defendant's affirmative defenses.  *See* ECF No. [94]. Defendant has moved for summary judgment on all four of

---

[11] Specifically, Plaintiff asserts that summary judgment should be entered regarding Defendant's (1) use of its trade secrets and (2) acquisition of Plaintiff's trade secrets under circumstances giving rise to a duty to maintain its secrecy.  *See* ECF No. [94], at 5–10.

Plaintiff's claims and on its statute of limitations defense as to all four causes of action.  *See* ECF No. [99].

Each of Plaintiff's claims requires a showing that Defendant used or disclosed Plaintiff's ideas.  That is to say, if Defendant can show that there is no genuine issue of material fact that it did not use Plaintiff's ideas, then all of Plaintiff's claims fail as a matter of law.  As discussed in more detail below, even Defendant's statute of limitations defense requires a finding that there was no use by Defendant of Plaintiff's idea.  As such, the Court begins its analysis by as to this material and dispositive issue.

### A.    Defendant did not use or disclose Plaintiff's repo exchange ideas.

In its motion and opposition to Defendant's motion, Plaintiff has articulated six ways in which Defendant used[12] or disclosed Plaintiff's repo exchange ideas: (1) the February 11, 2009 email and subsequent email exchanges among Defendant's employees; (2) the spreadsheet created by  Kidwell that was attached to the February 11, 2009 email; (3)  Algreen's testimony "acknowledging" that Defendant used Plaintiff's information as part of its efforts to develop a repo exchange; (4) Defendant's September 2014 and December 2014 Direct Repo presentation decks; (5) Defendant's April 2015 and August 2015 newsletters; and (6) Ms. Kidwell's affidavit and testimony alleging that  Kidwell disclosed Plaintiff's ideas to third parties.  *See* ECF No. [108], at 7.  The Court will address each argument in turn.

### 1.    The February 11, 2009 email and spreadsheet.

Plaintiff first contends that discussion of Plaintiff's ideas, as included in Kidwell's spreadsheet, among Defendant's senior personnel in emails beginning on February 11, 2009, constitutes "use" of its ideas.  *See* ECF No. [94], at 5–8.  As previously detailed, on February 11,

---

[12] The parties agree that, as used in the Agreement, "use" or "utilize" means "to put into use for some business purpose."  ECF Nos. [109], at ¶ 55; [125–2], at ¶ 55.

2009,  Kidwell emailed a spreadsheet to Messrs. McCauley, Wyler, Doyle, Algreen, Mike Reger,

Aaron Sterns, and Jerry Dupont that "summarize[d] the different nuances of what [ Kidwell saw]

as 8 possible solutions" to "the electronic delivery of AVM RPX or something akin to it."  ECF

No. [94–2], at 12.  The spreadsheet provided information on how the potential partner would fit

into Defendant's idea for a repo exchange, including, among other details, what Defendant's role

would be, what the role of the other party would be, and the cost, benefits, and drawbacks of

each option.  *See Id*. at 26.  The information provided for in the spreadsheet, moreover, had not

been vetted by Defendant or Mr. Kidwell and was simply included as it was presented to

Defendant.  *See* ECF No. [104–1], at ¶ 40.

At the request of  Wyler, Defendant's then-General Counsel,  Algreen, Defendant's then-

Chief Technology Officer, provided comments on several of the options, including Plaintiff's.

*See Id*. at 32–33.  As to Plaintiff, Algreen observed: "I fail to see the advantage of partnering

with [Plaintiff] besides their vision, but honestly, I'm not sure I fully understand the strategy."

ECF No. [94–2], at 33.   Kidwell responded to Algreen, stating that while Plaintiff's "unique idea

of using insurance companies and factoring agents to guarantee or indemnify trades is intriguing

. . . . [Plaintiff's ideas] may be too different from what the overall repo market is used to or

expecting as a solution."  *See Id*. at 32.

These discussions do not constitute an unlawful use of Plaintiff's ideas, however, because

the Agreement signed by the parties expressly provided for this type of internal exchange.  The

Agreement states, in relevant part:

> In connection with ongoing discussions about the repo markets and the creation of
> one or more repo "exchanges" (collectively, the "Proposed Transaction"),
> [Defendant] . . . and [Plaintiff] . . . hereby agree as follows . . . . [Plaintiff] may
> similarly provide [Defendant] with documents or information relating to the
> Proposed Transaction that is confidential, proprietary to [Plaintiff] or otherwise
> not generally available to the public.  This includes but is not limited to – creative

financial advice and ideas in regard to the creation of the above referenced exchange/exchanges.  All such documents and related information provided by either party shall be known as the "Information" . . . . By signing this Confidentiality Agreement, the parties further agree that their obligation to maintain confidentiality extends to all of the Information, except for Information . . . (5) *that is disclosed only to the Receiving Party's employees, officers, auditors, legal or other professional advisors where such employees, officers, auditors, legal or other professional advisors are advising upon matters related to the Proposed Transaction.*

ECF No. [94–1], at 6–7.  There is no dispute that the spreadsheet created by Kidwell was disseminated only to Defendant's employees that were working on Defendant's repo exchange idea at the time.  There is also no dispute that the email exchange that followed surrounding the spreadsheet occurred only between Defendant's employees.  Finally, there is no dispute that the "discussions [were] about the repo markets and the creation of one or more repo 'exchanges.'" *Id.*  Because the plain language of the Agreement entered into by the parties expressly provided for internal discussion among Defendant's (and Plaintiff's) employees of the ideas and information exchanged, there is no genuine issue of material fact that the email discussion beginning February 11, 2009, about Plaintiff's proposals as included in the spreadsheet did not constitute unlawful "use" by Defendant of Plaintiff's ideas.  *See Arriaga v. Fla. Pac. Farms, L.L.C.*, 305 F.3d 1228, 1246 (11th Cir. 2002) ("Under Florida law, courts must give effect to the plain language of contracts when that language is clear and unambiguous).

### 2.   Algreen's testimony.

Plaintiff claims that Algreen admitted in his testimony that Defendant used Plaintiff's information, "thereby violating the Agreement."  ECF No. [108], at 2–3.  As the basis for its assertion, Plaintiff relies on the following single line of questioning:

Plaintiff's Counsel:    So, basically, in this spreadsheet, AVM had gathered information from various third parties and then used that information, basically, as part of figuring out how to develop a Repo Exchange.  Is that fair?

Algreen:              Yes.

ECF No. [94–2], at 31.  As the Court explained in the previous subsection, Defendant's inclusion of Plaintiff's ideas in the spreadsheet, and then its ensuing discussion among Defendant's senior personnel of those ideas, was explicitly allowed for by the Agreement.  Moreover, Plaintiff's contention that "[Defendant] gathered the information in the Spreadsheet from various third parties—including [Plaintiff]—and then used that information as part of figuring out how to develop a repo exchange," ECF No. [108], at 2–3, is not in dispute.  Rather than proving that Defendant used Plaintiff's ideas in some unlawful fashion, this one line of testimony simply confirms what a plain reading of the spreadsheet and emails already reveal: that Kidwell prepared a spreadsheet summarizing the various options and potential partners Defendant was considering in and around February 2009 for the development of its repo exchange.  Algreen's testimony does not change this fact in any material way.

### 3.    Defendant's presentation decks and newsletters.

Plaintiff asserts that one of its unique ideas "involved building a repo exchange in phases," and that Defendant used this idea "in conceiving and developing a repo exchange without [Plaintiff]."  ECF No. [94], at 8.  As evidence, Plaintiff submits two of Defendant's Direct Repo presentation decks from September and December 2014.  Those decks stated:

> [Defendant] has developed a website for Direct Repo™ at www.directrepolive.com which we refer to as DRX.  In Phase 1, DRX transactions will remain over-the-counter and will rely on name give-up, prior documentation, and prior credit lines, in order to execute repo transactions. In phase 2, we intend to add more cash investment alternatives and move towards electronic matching and execution of Direct Repo™.[13]

---

[13] The September 2014 presentation deck only described Phase 1.  *See* ECF No. [94–2], at 40.  The December 2014 presentation deck included the description of Phase 2.  *See Id.* at 61.

ECF No. [94–2], at 40, 61.  In further support of its claim that Defendant used its idea to develop

an exchange in phases, Plaintiff points to two newsletters containing the following paragraph:

> Regarding our www.directrepolive.com website, the first phase has real-time
> indicative Direct Repo™ rates for over-the-counter trading (OTC), (subject to
> counterparty credit approvals, AVM broker agreements, and MRA
> documentation.) [sic]  There are also Repo Market Insiders, the White Paper (my
> 71-page "Regulatory Reform: Potential Impact On The Repo Market"), which
> already has an update that appears under "Content" on the website, product
> notes/presentations, information about AVM, and this AVM Repo Commentary
> available on the website.  Phase 2 of Direct Repo Live (DRX) will have electronic
> trading for Direct Repo.  Phase 3 will have additional short-term investment
> products, including synthetic repo, Single Treasury Futures, etc.  Phase 4 will
> likely have a CP product and an exchange/CCP product.[14]

*Id.* at 74.  Plaintiff's argument is unavailing.  First, the record is clear that Defendant's idea for a

repo exchange predates Plaintiff's meeting with Defendant by at least three months: as early as

October 2008, Defendant was considering and discussing its ideas about a repo exchange both

internally and externally.  *See supra* Part I, at 3.  More importantly, there is substantial record

evidence that, since its inception, Defendant's repo exchange concept was considered to be the

final step in the planned evolution of Direct Repo.  *See Id.*  In other words, Defendant always

conceived that its repo exchange would develop in phases.  *See Id.*; *see also* ECF No. [104–1], at

¶¶ 15, 18; ECF No. [101–3] (October 17, 2008 email from Doyle to Convexity Capital

Management stating that AVM "foresee[s] the creation of an exchange *as being the end game of

the Direct Repo concept*") (emphasis added); ECF No. [101–4] (October 20, 2008 email from

Doyle to the Federal Reserve Bank of New York stating that "a 'repo exchange' . . . *is a natural

evolution of the Direct Repo concept*") (emphasis added); ECF No. [101–6] (October 22, 2008

email from  Kidwell to the Bank of New York Mellon stating "[AVM] have decided to take the

discussion *a step further or to the next evolutionary step* and have engaged some of the clearing

---

[14] The quoted text is from Kidwell's April 2015 newsletter.  *See* ECF No. [94–2], at 74.  The August 2015
newsletter cited by Plaintiff simply adds a reference to partnerships with the Bank of New York Mellon
and "Nasdaq/OCC" in relation to Phase 3.  *See Id.* at 95.

houses, vendors, and the Federal Reserve *about a market-wide Repo Exchange (Repo Depot?)*
*which could facilitate Direct Repo*") (emphasis added); ECF No. [104–5] (October 27, 2008

email from  Doyle to the New York Stock Exchange stating that "[ Doyle] would like to follow

up with you on the repo exchange idea" and "[i]n the meantime, we've spoken to Tradeweb

about our 'Direct Repo' concept, *which is a precursor to the exchange*") (emphasis added); ECF

No. [101–23], at 15 (Defendant's November 2008 Direct Repo presentation deck referencing the

"Future Development of Direct Repo" to include "[a] public Repo Exchange where Direct

Repo™ can be transacted OTC or electronically"); ECF No. [101–23], at 2 (December 5, 2008

email from Kidwell to Bloomberg stating "I wanted to give you an update on Direct Repo, which

. . . is the product I am spear-heading (*along with the one to follow, a public Repo Exchange-*

*RPX*)") (emphasis added); ECF No. [94–2], at 33 (February 12, 2009 email from Algreen to

AVM senior personnel commenting on another option included in  Kidwell's spreadsheet and

stating, "For H, I envision two phases, phase one is an online marketplace, analogous to

craigslist.  This phase could be delivered in 6-9 months through aggressive development

lifecycle on our part utilizing strategic technology partnerships.  Phase two would incorporate the

Clearing/CCP "Exchange" nature of the solution . . . .").

In its response to Defendant's motion for summary judgment, Plaintiff argues for the first

time that the inclusion of a "CP product" in Phase 4 of Defendant's April 2015 and August 2015

newsletters is proof that Defendant is using its ideas.  The argument is as follows:

> Recall that in the Spreadsheet, [Defendant] listed eight options for developing a
> repo exchange.  Of these, seven involved a central counterparty (CCP).  Only one
> option—[Plaintiff]—did not include a central counterparty.  Instead, [Plaintiff's]
> repo-exchange option involved participants dealing directly with each other.
> Thus, under [Plaintiff's] model, the participants dealt with counterparties (CPs)
> not central counterparties (CCPs).  When [Defendant] said that phase 4 "will
> likely have a CP product," it was referring to [Plaintiff's] exchange product – the
> only counterparty (CP) product that [Defendant] ever reviewed.  In other words,

this document shows that [Defendant] continued to work on developing [Plaintiff's] CP repo exchange in 2015.

ECF No. [108], at 5.  The parties disagree and the record is unclear as to the meaning of "CP" in Defendant's newsletters.  Defendant claims that "CP" stands for "commercial paper," *see* ECF No. [123–3], at ¶¶ 8–11, while Plaintiff claims that "CP" stands for "counterparty," *see* ECF No. [108], at 5.  At best, there exists a dispute as to the meaning of "CP" in Defendant's 2015 newsletters.  In his testimony, however,  Carbonella admits that "CP" could also stand for "cash provider" or "clearing party."  *See* ECF No. [123–2], at 11.  In other words, Carbonella does not have actual knowledge or evidence to support his contention that "CP" stands for counterparty.  Instead, Plaintiff states that, "Drawing all inferences in [Plaintiff's] favor, "CP" in this context means counterparty, *i.e.*, [Plaintiff's] repo-exchange idea, the only counterparty product [Defendant] considered."  ECF No. [132], at 3.

Yet even if the Court were to infer that "CP" stands for counterparty, Plaintiff's line of reasoning lacks merit for the following reasons.  First, "participants dealing directly with each other" rather than through a dealer is another concept that Defendant thought of prior to any meeting with Plaintiff.  It is undisputed that Direct Repo, which Defendant began to develop by October 2008 at the latest, was an effort "to pair collateral providers (borrowers) and cash providers (lenders) in a direct transaction with no dealer in the middle" on an electronic trading platform.  *See* ECF Nos. [104–1], at ¶ 7; [109], at ¶ 7.  The concept behind Direct Repo then began to evolve to include an exchange with a central counterparty.  ECF Nos. [104–1], at ¶¶ 15–16; [109], at ¶¶ 15–16.  The "disintermediating" of repo dealers, therefore, was another concept Defendant was developing prior to meeting with Plaintiff.

Second, Plaintiff has at all times maintained that his ideas involved an exchange with certain unique features, such as the use of insurance and factoring agents to indemnify its users.

*See* ECF No. [108], at 10.  None of Defendant's literature cited by Plaintiff—in fact, none of the evidence cited by Plaintiff in relation to any of its arguments—mentions the use of insurance, factoring agents, or any of the other "unique" features of Plaintiff's repo exchange.  The cited document, however, states: "Phase 4 will likely have a CP product *and* an exchange/CCP product."  None of the preceding phases mentions anything about an exchange.  A plain reading thus demonstrates that the only exchange mentioned is in reference to the CCP (central counterparty) product.  Regardless of what "CP product" actually stands for, then, it is evident that it is not an exchange, which is the only idea that Plaintiff presented to Defendant.

The Court's analysis would change, of course, if Defendant's phasing of its repo exchange idea used features derived from Plaintiff's repo exchange idea.[15]  Plaintiff, however, has failed to offer any evidence or detail concerning what the actual substance of its "phases" was.  In support of its allegation that one if its ideas involved developing a repo exchange in phases, Plaintiff cites to: (1)  Carbonella's own affidavit, where he states only that "[b]oth at and following the January 2009 meeting, [Plaintiff] also shared with [Defendant] its ideas relating to developing the repo exchange in various phases," ECF No. [94–1], at ¶ 12; (2) its own responses to interrogatories requesting Plaintiff to describe "with particularity each and every" one if its ideas, and to which Plaintiff stated in response that "[t]his platform could be implemented in phases or segments, depending on the business and operational strategy selected by [Plaintiff] and [Defendant]," ECF No. [94–2], at 3, 5; and (3) an email Carbonella sent to Messrs. Kidwell

---

[15] Indeed, Plaintiff has conceded that various features surrounding its repo exchange idea—such as "a brand new futuristic exchange," preregistering and preapproving parties, an "exchange that operates 24/7," trading on leverage, insurance, indemnification, financial guarantees, and creating new credit—are not proprietary in and of themselves.  *See* ECF Nos. [104–1], at ¶ 37; [109–1] at ¶ 37.  Similarly, the Court has serious doubts that simply developing a product in phases or steps is proprietary to anyone. Algreen testified, for example, that "the phase one, two and three is purely the [Chief Technology Officer's] way of thinking about it from a technology perspective."  ECF No. [111–5], at 5.  Such an inquiry is not necessary, however, due to the ample evidentiary support demonstrating that Defendant's ideas for developing an exchange in phases predated its meeting with Plaintiff.

and Doyle on February 10, 2009, where he stated that "[w]e have concluded (in worse case [sic] scenario) PHASE 1 can be operational in 2-3 months time, and ALL phases (as we presently see them) can be operational in less then [sic] 10 months," ECF No. [94–1], at 65.

The Court first notes that Carbonella's affidavit and interrogatory responses were documents prepared for this litigation.  The only contemporaneous, and not self-serving, evidence presented is the February 10, 2009 email.[16]  Yet the email fails to provide any detail regarding what Plaintiff's phases for developing an exchange actually entailed.  Thus, Plaintiff's cryptic and conclusory statements cannot support a finding that its vague reference to phases had any bearing on Defendant's phased approach to its own repo exchange, especially in light of compelling evidence to the contrary.  *See Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) ("[M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion.").[17]

### 4.    Ms. Kidwell's affidavit and testimony.

Plaintiff alleges that after the January 30, 2009 meeting between the parties, Defendant "was setting up and attending meetings with various third parties, such as the [FRB], the [BNYM], the NY Mercantile Exchange, and the [NYSE]."  ECF No. [108], at 4.  That Defendant

---

[16] Conspicuously absent from Plaintiff's PowerPoint presentation to Defendant on January 30, 2009, for instance, is any mention or discussion of phasing in its repo exchange idea.  *See* ECF No. [94–1], at 8–63.
[17] Plaintiff asserts that Messrs. McCauley and Kidwell lied under oath about Defendant's efforts to develop a repo exchange in phases.  *See* ECF No. [108], at 5.  When McCauley was asked, "Did [Defendant] ever come up with phases in which the repo exchange could be implemented?", he responded, "No . . . . I don't believe so."  ECF No. [108–1], at 17–18.  However, in other parts of his testimony,  McCauley stated that "[t]he idea [of a repo exchange] *evolved from a product* that we had been talking about for some time called direct repo," ECF No. [104–2] at 15, "DRX is direct repo.  The 'X' we threw it on *for the potential future use as an exchange*," ECF No. [108–1], at 19, and that "[ Kidwell] evolved into more of a salesman, sell the idea of direct repo *and then repo exchange*[,]" *Id*. at 13–14.  And when Kidwell was asked, "Was there ever a discussion of developing a repo exchange in phases?", Kidwell responded, "That would require me to look at the documents, but I don't recall phasing in a repo exchange.  But I could be wrong.  I'd have to see the documents during that time period."  *Id.* at 97–98.  Indeed, a review of Defendant's contemporaneous emails and documents show that Defendant's repo exchange was intended to be the final step or phase of its Direct Repo product.

was having meetings with these entities is not in dispute.  *See supra* Part I, at 13–14.  According

to Plaintiff, however, "record evidence shows that [Defendant] was discussing and disclosing

[Plaintiff's] ideas at those meetings."  ECF No. [108], at 4.

 The only support for Plaintiff's allegation comes from Ms. Kidwell, who stated

throughout her affidavit and testimony that Kidwell was proceeding with Plaintiff's exchange

idea and was pitching it to other companies.  *See* ECF No. [108–1], at 37–38, 73–77.  Ms.

Kidwell also stated that  Mr. Kidwell asked her to hide this information from  Carbonella, out of

concern that  Carbonella would implement the repo exchange faster than Defendant.  *See Id*.

 Yet upon a closer inspection of Ms. Kidwell's testimony, it is clear that Ms. Kidwell's

contentions were based on her own flawed assumptions.  For instance, Mrs. Kidwell testified that

it was her "understanding" that  Mr. Kidwell was "going to [third parties] and presenting the

idea, which was [Plaintiff's] idea about the repo exchange" because "[t]here was no talk of an

exchange prior to [2009]."  ECF No. [125–3], at 18.  Record evidence, however, establishes that

Defendant was developing its repo exchange idea by October 2008.  Ms. Kidwell's testimony

also shows that she did not understand either Plaintiff or Defendant's repo exchange idea.  When

asked what she understood  Carbonella's ideas to be, Ms. Kidwell stated that it:

> [W]as going to turn into an exchange, it was going to be international and
> national, the Fed was going to be – they were going to go through the Fed to do it.
> Don't ask me how, but I know the Fed was going to be involved.  Bank of New
> York was going to do something with I want it [sic] say processing, but I don't – I
> don't know the terminology. . . . And I know they need insurance – an insurance
> company.

*Id*. at 7–8.  Of course, it was Defendant's repo exchange that included plans for the Federal

Reserve's involvement as a potential central counterparty, while  Carbonella's pitch to  Kidwell

in January 2009 was based on the idea that a repo exchange could "be accomplished without the

Federal Reserve being involved."  ECF No. [101–11].  Ms. Kidwell's uninformed testimony, premised on erroneous assumptions, cannot and does not form the basis for a genuine issue of material fact.  *See Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) ("[S]tatements in affidavits that are based, in part, upon information and belief, cannot raise genuine issues of fact, and thus also cannot defeat a motion for summary judgment.").

Plaintiff has also submitted text messages exchanged between Mr. and Ms. Kidwell that purportedly demonstrate that Mr. Kidwell was using and disclosing Plaintiff's ideas.  Defendant argues that said messages are subject to the marital communications privilege because the conversations occurred over a year before divorce proceedings between the two commenced. *See* ECF No. [125–1], at 9.  Yet, even if the Court were to assume, without deciding, that the marital communications privilege is inapplicable, the text messages actually further undermine Plaintiff's position.  The following exchange occurred between the Kidwells on March 12, 2009:

Mr. Kidwell:  Just had an amazing breakfast meeting with NYSE at Boaca [sic] Resort!  They are ecstatic *with my exchange product* and want to start the process immediately!

Ms. Kidwell:  That's great!  What role will they play?

Mr. Kidwell:  They are the exchange and clearing housr [sic].  Guy said he is a 12 on a scale of 1 to 3! Best meeting I have ever had on topic.  They are committing 100 million. Don't say anything to michael.  It is all confidential. . . .

Mr. Kidwell:  I worry about Michael trying to build it.  I am SO psyched!!!!!!  It is happening!

Ms. Kidwell:  *With his INS idea*?

Mr. Kidwell:  Yes.  Very worried about that. . . .

Ms. Kidwell:  Maybe you should offer michael a fee for some sort for [sic] confidentiality agreement or something like that…

Mr. Kidwell:  We have confi agreement.  He threatened us that if we didn't move fast, he would build it.  His is fucked up though so it won't work.

Ms. Kidwell:  Fucked up? What do you mean?

Mr. Kidwell:   His plan has those convoluted insurance companies, factoring agents, and re-factoring which my clients aren't going to understand or want.

Ms. Kidwell:   So then why you worried about him?

Mr. Kidwell:   Don't know.  Just a feeling.

Ms. Kidwell:   Well I am sure he will pitch it to other people.  He feels he has a great idea with the INS issue.

Mr. Kidwell:   Yup.  I just have to get mine up first!!!!

ECF No. [108–1], at 43–51 (emphasis added).  The text messages speak for themselves, showing that Mr. Kidwell was concerned that Carbonella would attempt to implement Plaintiff's repo exchange idea, with its insurance and factoring agents, faster than Kidwell would be able to implement his own.  The messages also reveal that Kidwell did not think that Plaintiff's ideas were at all viable, seriously damaging Plaintiff's allegation that Defendant was pursuing its idea. And while Kidwell did ask his wife not to tell Carbonella—a person that the Kidwells were personally acquainted with—about his meeting with the NYSE, he did so because the meeting was "confidential."  This, of course, is true, as  Kidwell discussed "[*his*] exchange product" with the NYSE, and not Plaintiff's.  Thus, neither Kidwell nor Defendant was under any obligation to inform Plaintiff of its meeting with the NYSE, or any other entity, where only its own repo exchange idea was discussed.[18]

Plaintiff also claims that Defendant disclosed its repo exchange ideas to the FRB.  This argument, however, is another red herring by Plaintiff.  As support for this argument, Plaintiff has submitted excerpts from the testimony of the FRB's corporate representative,  Christopher Burke.  In his testimony,  Burke states that the first meeting between Defendant and the FRB

---

[18] Nevertheless, record evidence shows that  Kidwell did in fact inform  Carbonella of Defendant's meetings with the NYSE and BYNM following the parties' January 30, 2009 meeting, and that Carbonella expected (and gave his consent to) Defendant to speak with third parties about Plaintiff's idea. *See supra*, Part I, at 10.  The Court finds Plaintiff's allegations to be particularly disingenuous in light of this evidence.

"was in the October 2008 time frame" to discuss Direct Repo.[19]  ECF No. [108–1], at 84.  When

asked if "there [was] any discussion during that meeting of a repo exchange,"  Burke responded,

"No, not that I'm aware of."  *Id*. at 5.  In a subsequent meeting sometime in March 2009 to

discuss "the evolution of the product," however, Burke stated that a repo exchange was

discussed.  *Id*. at 87.  When asked what was discussed about a repo exchange, Burke stated he

had no recollection beyond: "That [Defendant] had a product that could act as agent for direct

repo participants and be a place that could help cash investors and collateral providers find each

other."  *Id*.

    Based on these statements, Plaintiff argues that Defendant used and disclosed its ideas

because the repo exchange was brought up with the FRB for the first time in March 2009, after

the January 2009 meeting when Plaintiff described its repo exchange ideas to Defendant.  *See*

ECF No. [108], at 14.  But Plaintiff's argument is undercut by other parts of Burke's testimony.

For example,  Burke stated that "the first example of [Defendant] recognizing the need for

something besides just direct repo seemed to be – *in writing* – seemed to be in January [2009].

*It's entirely possible that conversations before that, it had come up in terms of what we have nine*

*years later*."  *Id*. at 89 (emphasis added).  He continued, "The first time we have *written*

*documentation*, that [sic] that's the first time we heard about it.  There were, as we've noted,

phone conversations in addition to the email correspondence.  *So it's possible there was some*

*there*."  *Id*. at 90.    Burke also testified that Defendant was telling the FRB about the repo

---

[19] Messrs. Kidwell and McCauley testified that they first met with the FRB on September 15, 2008—the same day Lehman Brothers filed for bankruptcy protection.  *See* ECF No. [104–1], at ¶ 13.  While the only scheduled topic was Direct Repo, the conversation extended beyond Direct Repo due to the day's events to include conversations about the repo markets more generally.  *See Id*.  This meeting was the first time Messrs. Kidwell and McCauley recall discussing a repo exchange outside of AVM.  *See Id*.  While there is disagreement as to when exactly the first meeting between the FRB and Defendant took place, this fact is not material given that other record evidence establishes that, notwithstanding when the meeting took place, Defendant was discussing its ideas about a repo exchange with the FRB as early as 2008 (i.e., before the parties sat down in 2009).  *See infra*, Part III, Section 4, at 30.

exchange idea because it was "consistent with providing us updates on the evolution of the product and where it was going and how it might work and its role in the market." *Id*. at 88. Thus, Burke himself admits that there may have been discussions about a repo exchange prior to the March 2009 meeting and that these discussions were consistent with the talks that began in 2008 around the evolution of Direct Repo.[20]

The more important fact to note here, however, is the clear evidentiary support in the record establishing that Defendant did in fact discuss its repo exchange idea with the FRB by October 2008.  This evidence alone defeats Plaintiff's argument.  *See* ECF No. [101–4] (October 20, 2008 email from  Doyle to the Federal Reserve Bank of New York stating that "a 'repo exchange' . . . is a natural evolution of the Direct Repo concept"); ECF No. [101–6] (October 22, 2008 email from  Kidwell to the Bank of New York Mellon stating "[AVM] have decided to take the discussion a step further or to the next evolutionary step and have engaged some of the clearing houses, vendors, *and the Federal Reserve* about a market-wide Repo Exchange (Repo Depot?) which could facilitate Direct Repo") (emphasis added); ECF No. [104–14] (October 23, 2008 emails from  Kidwell to RBSGC stating "I have also been spending a lot of time/energy on brainstorming a new Repo Exchange (Repo Depot) to facilitate Direct Repo and *to involve the Fed*" and "my idea is to run a Repo exchange (Repo Depot or RPX)"); ECF No. [104–20] (November 2, 2008 email from  Kidwell to the Federal Reserve Bank of New York stating that "I am pleased that there is interest in the public exchange (I like to call RPX or REPO EXCHANGE) that we have been working on").

---

[20] Nothing in his testimony, moreover, suggests that any elements of Plaintiff's repo exchange idea, such as the use of insurance or factoring agents, was discussed at any point.

In sum, Plaintiff has failed to demonstrate that Defendant used or disclosed its repo exchange idea.  As such, there is no genuine issue of material fact that Defendant did not use or disclose Plaintiff's repo exchange ideas.

**B.      DTSA claim.**

In the first count of its Amended Complaint, Plaintiff seeks damages under DTSA, which provides that "[a]n owner of a trade secret that is misappropriated may bring a civil action under this subsection if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."  18 U.S.C. § 1836(b)(1).  DTSA defines misappropriation as the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or "disclosure or use of a trade secret of another without express or implied consent by a person who . . . at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret . . . ."  18 U.S.C. § 1839(5).

Even assuming that Plaintiff's repo exchange ideas are "trade secrets," Plaintiff has not carried its burden in demonstrating that there is a genuine issue of material fact regarding whether Defendant used its repo exchange ideas.  *See supra*, Part III, Section A.  To the contrary, record evidence establishes that there remains no genuine issue of material fact and Defendant did not use or disclose any of Plaintiff's ideas in violation of the Agreement or otherwise.  *See Id*.  Accordingly, Plaintiff's DTSA claim fails as a matter of law.  Defendant is entitled to summary judgment on Plaintiff's DTSA claim.[21]

---

[21] In its motion for summary judgment, Defendant argued that Plaintiff's DTSA claim is barred because the alleged misappropriation pre-dates the effective date of the civil penalty that Plaintiff seeks.  *See* ECF No. [99], at 18–19.  As the Court has found that there is no genuine issue of material fact that Defendant

### C.  FUTSA claim.

As the parties have recognized, misappropriation of a trade secret under FUTSA is substantively identical to DTSA: "Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or "[d]isclosure or use of a trade secret of another without express or implied consent by a person who . . . [a]t the time of disclosure of use, knew or had reason to know that her or his knowledge of the trade secret was . . . [a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit it use."  Fla. Stat. § 688.002(2)(b).  Thus, Plaintiff's FUTSA claim fails for the same reasons as its DTSA claim.  Moreover, because Defendant has shown that there is no genuine issue of material fact that it did not use or disclose any of Plaintiff's ideas in violation of the Agreement or otherwise, Defendant is also entitled to summary judgment on Plaintiff's FUTSA claim.

### D.  Breach of contract claim.

Under Florida law, a claim for breach of contract requires (1) the existence of a valid contract; (2) a breach of the contract; and (3) damages resulting from the breach.  *See Marseilles Capital, LLC v. Gerova Fin. Grp., Ltd.*, 784 F. Supp. 2d 1349, 1351 (S.D. Fla. 2011).  There is no dispute as to the existence or validity of the Agreement.  Plaintiff, however, has failed to establish that Defendant breached the Agreement.  Defendant, on the other hand, has shown that there is no genuine issue of material fact that it did not use or disclose any of Plaintiff's ideas in violation of the Agreement.  *See supra*, Part III, Section A.  Accordingly, Plaintiff's breach of contract claim fails as a matter of law, and Defendant is entitled to summary judgment on Plaintiff's breach of contract claim.

---

did not use Plaintiff's ideas, thereby defeating Plaintiff's DTSA claim as a matter of law, the Court need not reach this argument.

### E.    Fraudulent omission claim.

Plaintiff's final count is for fraudulent omission.  Under Florida law, "a claim for fraudulent concealment is the same as one for fraudulent misrepresentation." *Dugas v. 3M Co.*, 101 F. Supp. 3d 1246, 1253 (M.D. Fla. 2015).  Such a claim requires a plaintiff to prove that: "[1] the [defendant] concealed or failed to disclose a material fact; [2] the [defendant] knew or should have known the material fact should be disclosed; [3] the [defendant] knew [its] concealment of or failure to disclose the material fact would induce the plaintiffs to act; [4] the [defendants] had a duty to disclose the material fact; and [5] the plaintiffs detrimentally relied on the misinformation." *Aprigliano v. Am. Honda Motor Co., Inc.*, 979 F. Supp. 2d 1331, 1342 (S.D. Fla. 2013).

In the Court's Order granting and denying in part Defendant's motion to dismiss the Amended Complaint, the Court stated:

> [W]ith respect to Plaintiff's fraud by omission claim, the Court is satisfied that the Amended Complaint specifically alleges that certain omissions were made by Defendant—namely, Defendant's alleged failure to notify Plaintiff that following their January 29, 2009 meeting Defendant disclosed Plaintiff's confidential information during several meetings with other institutions—and that such omissions were intended to prevent Plaintiff from pursuing use of its own ideas and acting to enforce its rights under the Agreement.

ECF No. [56], at 13.  It is clear now, under the summary judgment standard and voluminous record before the Court, that there is no genuine issue of material fact that Defendant did not use or disclose Plaintiff's ideas in violation of the Agreement or any other duty to disclose.[22]  As a result, Defendant is entitled to summary judgment as a matter of law on Plaintiff's fraud by omission claim.

---

[22] What's more,  Carbonella believed that Messrs. Kidwell and Doyle "would speak to their clients about [Plaintiff's] ideas to see how they would take to it."  ECF No. [101–8], at 71.  He also testified that he had a "verbal agreement" with them "that they may speak to the end users to get feedback on, you know, their opinions."  *Id.* at 76.

**F.      Defendant's statute of limitations defenses applies to all of Plaintiff's claims.**

Defendant also moves the Court to dismiss all of Plaintiff's claims as time-barred under each claims' respective statute of limitations.  The statute of limitations for each of Plaintiff's claims are: (1) five years for breach of contract, *see* Fla. Stat. § 95.11(2)(b); (2) three years for a violation of DTSA, *see* 18 U.S.C. § 1836(d); (3) three years for a violation of FUTSA, *see* Fla. Stat. § 688.007; and (4) four years for fraudulent omission, *see* Fla. Stat. § 95.11(3)(j).

With respect to the breach of contract claim, the Court stated in its September 19, 2016 Order granting and denying in part Defendant's motion to dismiss Plaintiff's first Complaint that, "At this stage of the pleadings, and accepting Plaintiff's allegations as true, Plaintiff has sufficiently asserted that Defendant's alleged continued use of the confidential information may amount to a continuing breach of the Agreement, which, if demonstrated, would toll the statute of limitations on Plaintiff's breach of contract claim."  ECF No. [37], at 7.  The record on summary judgment has demonstrated that the facts underlying Plaintiff's allegations are false. Plaintiff has failed to demonstrate that Defendant used or disclosed its ideas: thus, the statute of limitations on its breach of contract claim is not tolled, and Plaintiff's claim is consequently time-barred.

Similarly, the Court concluded in its September 19, 2016 Order that the continuing tort doctrine, which "distinguishes between a single act that causes multiple, cascading harms, and recurrent, repetitive acts excepted from the running of the statute of limitations[,]" was potentially applicable because "Plaintiff ha[d] alleged Defendant's continued use of Plaintiff's confidential information and ideas, amounting to a continual tortious act."  *Id*. at 8.  As with the breach of contract claim, however, it is now clear that the factual predicate forming the basis for

the potential applicability of the continuing tort doctrine has not been established by record evidence.

Accordingly, Plaintiff's claims under DTSA, FUTSA, and for fraudulent omission are barred by their respective statutes of limitation.  *See Adams Arms, LLC v. Unified Weapon Sys., Inc.*, No. 8:16–cv–1503–T–33AEP, 2016 WL 5391394, at *5–6  (M.D. Fla. Sept. 27, 2016) (stating that DTSA has "a statute of limitations substantially similar to" FUTSA and accrues on "the date on which the misappropriation with respect to which the action would relate is discovered or by the exercise of reasonable diligence should have been discovered" (quoting 18 U.S.C. § 1836(d)); *see also Davis v. Monahan*, 832 So. 2d 708, 709 (Fla. 2002) (stating that fraud claim accrues when "plaintiff either knows or should know that the last element of the cause of action occurred").

First, the record is clear that Defendant did not use or disclose any of Plaintiff's ideas.  It is also undisputed that the last communication between the parties was an April 14, 2009 email Carbonella sent to  Kidwell.  *See* ECF No. [104–1], at ¶¶ 45, 47.  In the email,  Carbonella wrote that he "heard from one of [his] associates the FDIC has been approached to be a clearing house in a Repo Exchange" and hoped that Defendant was not the party approaching the FDIC.  *Id*. at ¶ 45; *see also* ECF No. [101–18].  At the end of the email,  Carbonella added: "It is interesting though because who ever [sic] it is is thinking along my ideas which I presented to your firm, of INSURANCE . . . Hmmm . . ."  ECF No. [104–1], at ¶ 45; *see also* ECF No. [101–18].  At his deposition,  Carbonella explained that by writing "Hmmm," it was "me saying, is this you?" ECF No. [101–8], at 83–84.

It is further undisputed that Plaintiff never followed up his April 14, 2009 email even though he suspected that Defendant was disclosing and/or using its ideas in violation of the

Agreement; nor has Plaintiff pursued its ideas for a repo exchange in any manner in the eight-plus years since Carbonella's April 14, 2009 email.  *See* ECF No. [104–1], at ¶ 47.  Moreover, between March 2009 and July 2014,  Kidwell sent at least 253 electronic communications to Plaintiff, entitled "AVM Repo Commentary," in which  Kidwell described his activities and Defendant's activities in the repo markets.  *See* ECF No. [104–1], at ¶ 48.  At least 144 of those Commentaries (including 107 commentaries from 2009) specifically referenced AVM RPX and how to access it.  *See Id*.

Accordingly, Plaintiff's DTSA, FUTSA, and fraudulent omissions are time-barred.

## IV.    CONCLUSION

There is no genuine issue of material fact that Defendant did not use or disclose any of Plaintiff's repo exchange ideas.  Because all of Plaintiff's claims require a showing that Defendant used or disclosed its ideas, all of Plaintiff's claims fail as a matter of law.  The Court also finds that the statute of limitations surrounding all of Plaintiff's claims are applicable, therefore barring Plaintiff's four claims.  For all of the reasons stated, it is **ORDERED AND ADJUDGED** that Plaintiff's Motion for Partial Summary Judgment, **ECF No. [94]**, is **DENIED**, Defendant's Motion for Summary Judgment, **ECF No. [99]**, is **GRANTED in full**, and Plaintiff's Amended Complaint is **DISMISSED WITH PREJUDICE**.[23] The Court will enter final judgment in favor of Defendant in a separate order.

---

[23] Both parties have pending motions to exclude their respective experts' testimony and opinions.  *See* ECF Nos. [96], [103].  Plaintiff relies on its expert to show that it has suffered damages, while Defendant uses its expert to show that Plaintiff's ideas were not trade secrets (i.e. were not proprietary or even viable).  *See Id*.  The Court notes that it did not depend or rely on any facts or information provided by the parties' experts in disposing of the motions for summary judgment.  Both of these motions to exclude, moreover, are now **MOOT** in light of the Court's granting of Defendant's motion for summary judgment in full.  In its motion for partial summary judgment, Plaintiff moved for entry of summary judgment on some of Defendant's affirmative defenses.  *See* ECF No. [94], at 13–17.  For similar reasons, the Court need not reach these arguments.  The Court also notes that there is a pending motion for sanctions filed by Defendant.  *See* ECF No. [116].  The Court will address the motion in a separate order.

Case No.  16-cv-80905-BB

**DONE AND ORDERED** in Miami, Florida, this 10th day of January, 2018.

_____

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:
Counsel of Record